UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

PETER G. GRAIN, M.D. and
ANNETTE BARNES, M.D.,
Jointly and Severally,

        Plaintiffs,

v.

TRINITY HEALTH, MERCY HEALTH
SERVICES, INC. D/B/A MERCY
– HOSPITAL PORT HURON,
MARY R. TRIMMER, JERE BALDWIN, M.D.,
BERNARD VELARDO, M.D., and
MAHMOUD CHAFTE, M.D.,
Jointly and Severally,

        Defendants.

03-72486

Civil Action No. _____

PATRICK J. DUGGAN

MAGISTRATE JUDGE PE

FILED
2003 JUN 26 P 1:05
U.S. DIST COURT CLERK
EAST DIST MICHIGAN
DETROIT

## VERIFIED COMPLAINT AND JURY DEMAND

### Jurisdiction

1.      This Court has jurisdiction over Counts I-II of this Verified Complaint pursuant to 28 U.S.C. §1331, as these claims arise under the laws of the United States. This Court has jurisdiction over Counts III-XVI pursuant to 28 U.S.C. §1367, the supplemental jurisdiction statute. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

### Parties

2.      The Plaintiff, Peter G. Grain ("Dr. Grain"), is a medical doctor specializing in neurosurgery. Dr. Grain is licensed to practice medicine in Michigan, Pennsylvania and Ohio. He is also an African American, a resident of the State of Michigan, and a citizen of the United States of America.

3.      The Plaintiff, Annette Barnes ("Dr. Barnes"), is a medical doctor. Dr. Barnes is African American, married to Dr. Grain, a resident of the State of Michigan, and a citizen of the United States of America.

4.      The Defendant, Mercy Health Services, Inc. d/b/a/ Mercy Hospital - Port Huron ("Mercy"), is a duly organized corporation under the laws of the State of Michigan with a principal place of business at 2601 Electric Avenue, Port Huron, Michigan. Mercy is a private hospital.

5.      The Defendant, Trinity Health, is a duly organized Corporation under the laws of the State of Michigan with a place of business at 28780 Cabot Drive, Novi, Michigan. Mercy is a wholly owned subsidiary of Trinity Health.

6.      The Defendant, Mary R. Trimmer ("President Trimmer"), is the President and Chief Executive Officer of Mercy, and has a principal place of business at 2601 Electric Avenue, Port Huron, Michigan, and a place of residence at 617 Edison Boulevard, Port Huron, Michigan.

7.      The Defendant, Jere Baldwin, M.D. ("Dr. Baldwin"), is a medical doctor and the Director of the Emergency Room at Mercy, and has a principal place of business at 2601 Electric Avenue, Port Huron, Michigan, and a place of residence in Fort Gratiot, Michigan.

8.      The Defendant, Bernard Velardo, M.D. ("Dr. Velardo"), is a medical doctor and anesthesiologist with prior privileges at Mercy, and had a principal place of business at 2601 Electric Avenue, Port Huron, Michigan, and on information and belief has a place of residence at 15409 Brem Lane, Charlotte, North Carolina.

9.      The Defendant, Mahmoud Chafie, M.D. ("Dr. Chafie"), is a medical doctor and administrator at Mercy, and has a principal place of business at 2601 Electric Avenue, Port Huron, Michigan, and a place of residence at 2708 Military Street, Port Huron, Michigan.

10.     At all pertinent times, Thomas A. Goldenbogen ("Mr. Goldenbogen") acted as the Vice President of Physician Networking Developing of Mercy, and has a principal place of business at 2601 Electric Avenue, Port Huron, Michigan, and a place of residence at 36500 Front Street, New Baltimore, Michigan. Mr. Goldenbogen had the responsibility of overseeing the profitability of the Physicians providing services to the Hospital.

11.     At all pertinent times, Diane E. Salo ("Ms. Salo"), acted as the Chief Operating Officer of Mercy, has a principal place of business at 2601 Electric Avenue, Port Huron, Michigan, and on belief has a place of residence at 11927 Fessner Road, Carleton, Michigan. Ms. Salo also had the responsibility of overseeing the profitability of the Physicians providing services in and to the Hospital.

### Background And The Recruitment Of Dr. Grain To Mercy

12.     Dr. Grain graduated from Massachusetts Institute of Technology in 1974 with a Bachelor of Science in Chemistry, and from Stanford University Medical School in 1981. Thereafter, Dr. Grain interned at Northwestern Memorial Hospital in Chicago, and completed a six (6) year residency in Neurosurgery at this hospital. Dr. Grain became Board Certified in Neurosurgery in 1993.

13.     Prior to arriving at Mercy, Dr. Grain practiced neurosurgery at various institutions, and held the following positions: (i) Clinical Instructor of Neurosurgery at Northwestern Memorial Hospital, (ii) Clinical Assistant Professor of Neurosurgery at the University of Illinois College of Medicine, (iii) Clinical Assistant Professor of Neurosurgery at the Medical College of Virginia, and (iv) Visiting Professor at Osler Institute Neurosurgery Board Review Course.

14.     From 1994 through August 1997, Dr. Grain maintained a successful neurosurgery practice in Fredericksburg, Virginia. For the most part, Dr. Grain performed spinal surgeries

involving the nervous system, and intracranial surgeries which involved aneurysms. He has

extensive experience and background in skull base, neurovascular, pituitary, stereotatic and

pediatric neurosurgery. While at St. Mary's Hospital in Virginia, Dr. Grain performed upwards

of 25-30 intracranial surgeries and 100 spinal surgeries each year.

15.     At some point prior to June 7, 1997, and as expressly noted in the Income

Guarantee Agreement which Mercy ultimately signed with Dr. Grain, Mercy determined that, "in

furtherance of its community obligation and charitable purpose it should recruit a neurosurgeon

to its service area in order to provide local community coverage of this needed specialty."

16.     Mercy also concluded that, "... after thorough evaluation by a special committee

of its Board of Directors, [it] has determined and concluded that the incentives and assistance

provided for in this Agreement [Income Guarantee Agreement] are reasonable and appropriate

given the initial cost associated with starting up a neurosurgery service in the Hospital's service

area."

17.     In the winter of 1996-1997, a recruiter retained by Mercy contacted Dr. Grain and

urged him to consider relocating to Port Huron, Michigan to lead a neurosurgery practice with

financial support from Mercy. Dr. Grain agreed to interview with Mercy.

18.     The 2000 US Census reports that Port Huron had a population of 32,388, an

African American population of 2,405, which is 7.7%, and a white population of 28,034, which

is 86.7%, and on information and belief, from 1997 to the present, the numbers have been and

are substantially the same.

19.     During the initial interview and recruitment process, Mercy made numerous

representations regarding the fertile market in the Port Huron area for neurosurgery based on

detailed actuarial data that Mercy claimed it had collected. Based upon these representations,

Dr. Grain agreed to apply for privileges at Mercy, and the other major area hospital, Port Huron General Hospital ("Port Huron General").

20.     During this period, in early 1997, Dr. Grain also began negotiating a contract with Mercy for initial financial support for his new practice, and he proposed that Mercy provide him an initial guaranteed income of $250,000.

21.     As Dr. Grain continued negotiations with Mercy over the terms of an income guarantee agreement, Port Huron General notified Dr. Grain that it would not offer him staff privileges, and this was known to Mercy.

22.     On information and belief, Port Huron General refused to offer Dr. Grain staff privileges because it did not want its competitor, Mercy, to have a financial stake in a neurosurgery practice located in Port Huron, and further just a few years earlier, in 1995, the Federal Trade Commission rejected the merger of Port Huron and Mercy.

23.     When Dr. Grain learned that Port Huron General considered itself a rival of Mercy and the likely effect of this rivalry on his ability to foster and sustain a practice, he immediately told Mercy that he wanted to cease negotiations.

24.     Undeterred, Mercy relentlessly pursued Dr. Grain.  For the next several weeks, numerous Mercy administrators and affiliated physicians contacted Dr. Grain and urged him to relocate to Mercy.  The volume of calls from Mercy became so overwhelming that Dr. Grain finally asked Mercy to stop calling his home.

25.     Approximately one week after Dr. Grain asked Mercy to stop contacting him, Mercy again pursued Dr. Grain with promises of its full support and express assurances of a vibrant practice in Port Huron by having Dr. Mark Rosenblum urge Dr. Grain to reconsider locating to Port Huron.

26.     Thereafter, Dr. Mark Rosenblum, who was involved in the negotiations on behalf of Mercy and also served as Chairman of Henry Ford Hospital's neurosurgery program, called Dr. Grain on behalf of Mercy and offered him a $400,000 income guarantee per year for three years.

27.     Dr. Grain expressed concern to Mercy officials and Dr. Rosenblum that a neurosurgery practice in Port Huron could not initially generate such high revenue.  However, Mercy officials expressly told Dr. Grain that they had reasonable financial expectations for the practice based on actuarial data, and urged him to sign the contract.

28.     Based upon the representations of Mercy and the assurances that he could easily build a practice with Mercy's support and cooperation, on June 27, 1997, Dr. Grain ultimately agreed and entered into a document entitled, "Income Guarantee Agreement" ("Guarantee Agreement").  A copy of the Guarantee Agreement is attached hereto and incorporated herein by reference as Exhibit 1.

29.     In making the decision to relocate his wife (and her medical practice) and minor children from Virginia to Port Huron, Michigan, Dr. Grain relied upon the express representations and warranties of Mercy that a neurosurgical practice was viable in Port Huron despite the actions of Port Huron General.

30.     At no time prior to the execution of the Guarantee Agreement did Mercy ever state or advise Dr. Grain that he had to meet certain financial requirements in terms of a dollar volume of business.  In fact, Dr. Grain did not have that type of arrangement at his prior place of employment and would not have accepted the position had Mercy set financial benchmarks.

31.     The Guarantee Agreement itself contained no provisions or benchmarks which would have required Dr. Grain to see a certain number of patients or perform a certain number of operations as a pre-condition of payment for his services.

32.     To the contrary, the Guarantee Agreement provided in Section 5.4 that, "nothing in this Agreement is intended nor shall be construed to allow the Hospital the right to exercise any control or direction over the manner or method by which Physician performs the services in connection with this Agreement," and Section 5.10 provided that, "nothing contained in this Agreement or implied, shall (1) make the benefits of this Agreement conditioned upon the referral of patients to the Hospital ... or (4) otherwise make conditional the benefits of this Agreement."

33.     The Guarantee Agreement provided, in pertinent part, in Section 2 that, "Hospital agrees, upon the terms and conditions contained herein, to provide Physician a three year income guarantee including cash bonus (as defined in Section Eight 8 (sic)) of $400,000 for years one and two, and $380,000 for year three (the "Income Guarantee Amount").

### Dr. Grain Is Discriminated Against
### And Set Up For Failure By Those Resentful Of His Appointment

34.     Subsequent to his arrival in the fall of 1997 from a thriving and well respected neurosurgery practice in Virginia, Dr. Grain quickly discovered that despite Mercy's steadfast representations of support for his practice and the viability of a neurosurgery practice, the Mercy administration itself had become bitterly divided over whether it should support a neurosurgery practice, and whether Mercy should have entered into such an Agreement with Dr. Grain.

35.     Several Hospital administrators and doctors opposed the Guarantee Agreement with Dr. Grain, did not want him to relocate to Port Huron, and did not believe that a neurosurgery practice was viable.

7

36.     Prior to agreeing to give up his practice in Virginia, Dr. Grain was not aware of this opposition, nor was he aware that the Board was in fact deeply fractured over his selection, opposed his contract, and intended to scrutinize his every move from day one.

37.     Soon after Dr. Grain's arrival at Port Huron, certain Mercy administrators and doctors collectively and, in concert, including President Trimmer, Dr. Baldwin, Dr. Chafte, Mr. Goldenbogen and Ms. Salo had second thoughts and began a plan to do away with neurosurgery and Dr. Grain at Mercy.

38.     Dr. Grain arrived in Port Huron on September 19, 1997, but did not plan to start practice until November 3, 1997, the date that his malpractice coverage was to commence.  Prior to November 3rd, Mr. Goldenbogen urged Dr. Grain on several occasions to begin seeing patients.  When Dr. Grain told Mr. Goldenbogen that he could not see patients and refused to do so because it would be illegal to do so without malpractice insurance, Mr. Goldenbogen responded that no one would ever know.

39.     Before Dr. Grain started his Port Huron practice on November 3, 1997, certain Mercy administrators and doctors including Ms. Salo and Dr. Chafte immediately demanded that Dr. Grain (i) add unneeded staff such as extra nurses; (ii) report on his practice through Mercy's nursing administration; and (iii) use expensive and unnecessary neurosurgery equipment that the Hospital purchased against Dr. Grain's input or request.

40.     In the initial months of his practice, Dr. Grain saw many patients.  Most did not require surgery.  However, almost immediately, President Trimmer, Dr. Baldwin, Mr. Goldenbogen, and Ms. Salo began to comment that Dr. Grain was not operating enough given the volume of patients he saw.

41.     Mercy began exerting extreme pressure on Dr. Grain to operate on more patients, even though Dr. Grain considered it medically inappropriate, unethical and illegal to conduct such operations and to file a claim for payment for such procedures.

42.     Frustrated by Dr. Grain's unwillingness to perform unnecessary surgeries to generate income for the Hospital and to cover the cost of the Guarantee Agreement, President Trimmer, Mr. Goldenbogen, and Ms. Salo initiated actions designed to hinder Dr. Grain's success so that there would be a financial basis to end the newly started yet controversial neurosurgery practice at Mercy.

43.     For example, Mercy required that Dr. Grain be proctored (observed) during his first several operations.  Although Mercy initially agreed to have neurosurgeons from Henry Ford Hospital available to perform the proctoring function, the Hospital made no effort to secure the proctoring physicians which forced Dr. Grain ironically to turn away several potential surgery candidates.

44.     Administrators at Mercy leaked information on the terms of his Guarantee Agreement to other physicians and staff for the purpose of undermining Dr. Grain's efforts to build a practice.

45.     During the period from November 3, 1997 through July 16, 1998, Mercy monitored Dr. Grain closely, including watching his office and travels, and commenting on his life style and associates.  Mercy constantly told him that he was not performing enough operations.

46.     On July 16, 1998, some eight months into his new practice in a new state and city, Mr. Goldenbogen sent a notice and demand letter to Dr. Grain advising him that he had breached

the Guarantee Agreement. A copy of the letter dated July 16, 1998 ("Mercy's July Letter") is attached hereto as Exhibit 2.

47.    Mercy's July Letter stated that Dr. Grain: (i) had not, "diligently establish[ed] a practice"; (ii) was to obtain privileges at other hospitals; (iii) had not taken the "initiatives"; (iv) failed to market his practice; and (v) had "damaged Mercy Hospital's ability to maintain a quality neurosurgery service in the communities served by the Hospital." Mercy reminded Dr. Grain that it paid him under the Guarantee Agreement, and demanded that he submit a business plan in twenty (20) days agreeable to the Hospital.

48.    Despite the claims of President Trimmer, Ms. Salo, Mr. Goldenbogen and Mercy, the Guarantee Agreement did not have any "benchmarks" for Dr. Grain's first year's performance. Notwithstanding, Mercy unilaterally began to establish benchmarks and demands that were not part of the original Agreement, and began to impose conditions on Dr. Grain which were intended to establish a basis to terminate the Guarantee Agreement.

49.    Mercy took these actions even though Section 12 of the Guarantee Agreement provided that it could not be amended unless agreed upon in writing by both parties.

50.    On August 3, 1998, Dr. Grain responded in writing to Mercy's July Letter and outlined his concerns raised by Mercy's treatment of him. A copy of the August 3, 1998 letter ("Dr. Grain's August Letter") is attached hereto and incorporated herein by reference as Exhibit 3.

51.    Dr. Grain's August Letter stated that: (i) Dr. Rosenblum had not been available as a proctor; (ii) it was difficult to "schedule" a neurosurgical procedure to meet a proctor's schedule; (iii) very few friendships had been offered to him; (iv) the patient pool was not reflective of the payor mix in the area, and could not "create a financially viable, quality

neurosurgical service"; (v) he felt pressured to meet the Income Guarantee; (vi) Port Huron

General refused to refer neurosurgical cases to Mercy Hospital; and (vii) he was a conservative

surgeon who would not perform unnecessary surgeries.

52.     When it became apparent that Dr. Grain's practice was not as "financially"

profitable as Mercy anticipated or expected, Mercy administrators conspired to create a basis to

terminate the Guarantee Agreement by falsely accusing Dr. Grain of poor patient care arising out

of four incidents in 1998.  Under the guise of the Peer Review process and in order to threaten

Dr. Grain and to force concessions under the Guarantee Agreement, Mercy initiated an

investigation.

53.     The Hospital took these actions in retaliation against Dr. Grain for not conducting

more operations, and for his refusal to file requests for payments relating to such unnecessary

procedures.

54.     The first patient care incident occurred on February 25, 1998, when Dr. Grain

performed an anterior cervical fusion surgery.  Several hours after discharge from Mercy, the

patient began to have difficulty swallowing.  On the way to Dr. Grain's office for an

examination, the patient suffered respiratory arrest.  The patient arrived at Mercy's Emergency

Room with two apparent endotracheal tubes inserted by paramedics, who tended to the patient

when he entered respiratory arrest.  On the patient's arrival at Mercy's Emergency Room,

Dr. Grain realized that these tubes were not helping the patient breathe.  He immediately ordered

the emergency room physician to reintubate a tube.  The emergency room physician reintubated

a tube, but the patient still could not breathe and died.

55.     Dr. Grain's investigation into this situation strongly supports the belief that the

patient had a respiratory arrest secondary to laryngospam from hemorrhage likely caused in part

by administration of several doses of Toradol, a pain medication, which causes hemorrhaging combined with the patient's severe alcoholism. The Mercy Nursing staff gave the patient Toradol against the patient's wishes.

56.     Dr. Grain also learned that the emergency room physicians did not insert the breathing tube into the patient's trachea but rather placed the tube in the patient's esophagus, which ultimately caused the patient's demise. After Dr. Chafte, a Hospital administrator, became aware of this fatal error by the emergency room physician, he asked the pathologist, who performed the autopsy on the patient, to falsify the records and coached the nurses on the "proper" responses to questions about the incident.

57.     Mercy blamed Dr. Grain for this incident and sought to discredit his ability to perform surgery even though the true reason for this poor outcome had nothing to do with Dr. Grain's performance.

58.     The next incident occurred in July 1998. Dr. Grain saw a patient with extreme back pain. He ordered radiology to conduct a lumbar myelogram on the patient, and subsequently performed surgery. After the surgery, the patient had severe complications, including a spinal cord injury. Dr. Grain attempted to investigate the injury by contacting Mercy Radiology Department members who had conducted the myelogram but no one from Radiology would speak to Dr. Grain.

59.     Not until the summer of 2002 did Dr. Grain learn that it was determined, shortly after the 1998 incident, that a radiologist had caused the spinal injury by "jamming" the needle into the patient's spinal cord. However, the radiologist and others in his department perpetuated the rumor that Dr. Grain was responsible for the patient's injury. Despite having knowledge of

the real cause, Mercy used this information under the guise of a Peer Review to threaten and coerce Dr. Grain to release the Hospital from the Guarantee Agreement.

60.    A third patient care incident occurred in September 1998. Dr. Grain conducted surgery on an unruptured giant aneurysm. During the surgery, Dr. Grain discovered a daughter aneurysm which ruptured during surgery. In two minutes, Dr. Grain secured the aneurysms. The patient made an unremarkable recovery from surgery.

61.    Dr. Grain became tense during the critical period immediately after the aneurysm ruptured. After the surgery, the anesthesiologist in attendance, Dr. Velardo, falsely and maliciously reported Dr. Grain to Mercy administrators as being "out of control" during the surgery even though Dr. Grain successfully saved the patient's life.

62.    The final patient care incident also occurred in September 1998, and also involved Dr. Velardo. Dr. Grain performed an anterior cervical fusion on a patient. The patient was a severe alcohol abuser and had received several postoperative doses of Toradol. The patient suffered hemorrhaging. Dr. Grain performed additional surgery to investigate risk from the hemorrhage, and determined that the patient was not in danger. At the conclusion of the surgery, Dr. Grain instructed Dr. Velardo to remove the patient's endotracheal breathing tube; Dr. Velardo refused and assumed management of the patient's breathing. Over the next several days, Dr. Velardo managed the patient's breathing by keeping the endotracheal tube in place, which caused the patient unnecessary pain and injury. Several days later, Dr. Velardo was removed from the case and another doctor removed the tube. Eventually, the patient was discharged without further complications.

63.    Rather than accepting responsibility for botching the patient's post-operative care, Dr. Velardo and Dr. Chafte maliciously and intentionally made several negative comments about

Dr. Grain's performance, and falsely suggested that Dr. Grain caused the patient's improper post-operative intubation.

64. Despite Mercy's knowledge that these were four bogus allegations of improper patient care, Mercy seized the opportunity on October 6, 1998 to limit Dr. Grain's ability to practice and to get out from under the Guarantee Agreement. Mercy's Chief of Surgery, Dr. Walid Demashkieh, informed Dr. Grain that in the future he needed to provide a proctor for all intracranial, cervical, and lumbar procedures that he wished to perform at Mercy. When Dr. Grain asked why, Dr. Demashkieh stated that he was "dangerous" and quoted negative comments by Dr. Velardo about his performance. Dr. Demashkieh made his decision with consultation from Dr. Jim Copping, the Mercy Chief of Staff, and Dr. Copping said that, "Dr. Grain would never perform another aneurysm procedure at Mercy."

65. Mercy intentionally idled Dr. Grain's practice for the next two months, and fostered and/or condoned a maelstrom of rumors and speculation concerning his competence and ability to continue his neurosurgery practice which spread throughout the Hospital and the Port Huron medical community. This had a devastating impact on Dr. Grain's ability to attract patients.

66. In October 1998, only one year into his three-year Guarantee Agreement, Mercy informed Dr. Grain that it engaged neurosurgeons at Henry Ford to conduct a quality review of his work at the recommendation of Dr. Chafte. At the same time, Mercy administrators continued to spread malicious rumors about Dr. Grain's competence. On information and belief, they were unhappy with the profitability of Dr. Grain's practice given the amount they agreed to pay him under the Guarantee Agreement and these administrators continued their conspiracy to

use peer review and alleged lack of business to get out of the Guarantee Agreement they had agreed to.

67.    Confronted with a swiftly deteriorating situation, Dr. Grain approached a high-ranking Mercy official, Dr. Chafte, to discuss the situation. Dr. Chafte scoffed at Dr. Grain's concerns regarding his treatment, and threatened Dr. Grain by stating "don't forget you still have privileges to get."

68.    In November 1998, the Henry Ford neurosurgeons completed their review of Dr. Grain's cases, and found (notified) that Dr. Grain had <u>committed no patient care errors</u> despite the claims of Mercy. A copy of the letter dated January 26, 1999, to Dr. Grain concerning the review is attached hereto as Exhibit 4.

69.    Despite this review, Mercy continued to undermine Dr. Grain and his practice in an effort to seek an out under the Guarantee Agreement. On November 11, 1998, Mercy instituted another onerous sham: it required Dr. Grain to present every neurosurgery proposal for prospective review and approval by a Henry Ford neurosurgeon. This further requirement caused more rumors about Dr. Grain's competence, caused him to lose more patients, and to suffer additional damage to the prospects for his practice. Considering the positive outcomes of both the Peer Review and proctoring requirements, this action was prejudicial and without precedent.

70.    At the same time that Mercy instituted this rule, it began removing the intracranial surgery equipment from Mercy's Operating Room. When Dr. Grain inquired why the equipment was being removed to the basement of the Hospital, he was told that it was because Mercy did not plan on hosting many more intracranial surgeries.

71.     Between November 1998 (the date of the Peer Review conclusion) and January 26, 1999, President Trimmer, Mr. Goldenbogen, Ms. Salo, Dr. Baldwin, Dr. Velardo, and Dr. Chafte, knew or were aware that the Peer Review cleared Dr. Grain of any improper patient care.

72.     On information and belief, by this time President Trimmer, Mr. Goldenbogen, Ms. Salo, Dr. Baldwin, Dr. Velardo and Dr. Chafte had developed an intense dislike and animosity against Dr. Grain fueled by his race, his refusal to perform unnecessary procedures, his protection of his professional reputation, and Mercy's inability to make more money on Dr. Grain's practice.  They treated Dr. Grain differently than other Caucasian doctors and generally held him to a different standard.

73.     Although Mercy, President Trimmer, Mr. Goldenbogen, Ms. Salo, and Dr. Chafte knew that Dr. Grain had been exonerated, they continued the campaign to coerce and threaten Dr. Grain in order to cancel his Guarantee Agreement.  Repeated and malicious threats were made that he would not be granted privileges or his privileges would be suspended.  Everyone knew that if Mercy took such actions, it would cause irreparable harm to Dr. Grain's career.

74.     At the direction of President Trimmer, Mr. Goldenbogen and Ms. Salo threatened Dr. Grain that he would not be given privileges at Mercy unless he released the Hospital from the Guarantee Agreement, and Ms. Salo noted that she knew what the Board wanted.

75.     President Trimmer, Mr. Goldenbogen and Ms. Salo made this threat repeatedly, and they each had the knowledge that Dr. Grain had been exonerated of improper care claims, and that if Dr. Grain lost his privileges, his professional career of over eighteen (18) years as a neurosurgeon would be destroyed beyond repair as the damage would be irreparable.

76.    Dr. B. Ramesh Reddy, then Chief of Staff of Mercy, advised Dr. Grain to release the Hospital from the Guarantee Agreement, and Dr. Reddy advised Dr. Grain that, "no way you can allow this [loss of privileges] to happen, it will follow you the rest of your career." Dr. Reddy was particularly aware of the voracity of Mercy's desire to injure Dr. Grain's career, giving what he felt was prudent advice.  Dr. Reddy expressed genuine fear for Dr. Grain. Dr. Thomas Coury, Chief of Surgery of Mercy also discussed with Dr. Grain the implications of losing privileges.

77.    In January 1999 and in order to exert additional pressure on Dr. Grain, President Trimmer called Dr. Krishna Valjee, the former Chief of Staff and Chief of Surgery at Mercy, out of surgery and urged Dr. Valjee to explain to his friend Dr. Grain that it would be in his best interests to release Mercy from the Guarantee Agreement.  Dr.Valjee was insulted by the request to coerce Dr. Grain and told President Trimmer that he would be sure to tell Dr. Grain of this meeting.  Dr. Valjee advised Dr. Grain of the meeting and the long lasting and immeasurable damage to his professional reputation if Dr. Grain lost his hospital privileges.

78.    President Trimmer, Ms. Salo and Mr. Goldenbogen advised Dr. Grain that if he released the Hospital, Mercy would not suspend or terminate his privileges or in other words -- irreparably harm to his career.

79.    Daunted by pressure and threats from Mercy administrators to deny him Hospital privileges if he refused their request, which would have been a permanent and fatal mark on his professional record and even though he had been cleared by an independent review of any patient misconduct claims, Dr. Grain signed a Release Agreement on February 2, 1999.  A copy of the February 1999 Release Agreement is attached hereto and incorporated herein by reference as Exhibit 5.

80.    Shortly after he signed the Release Agreement, Dr. Grain found himself with a practice in ruins. He developed an acute case of depression due to Mercy's discriminatory and coercive campaign. Content that they had succeeded in their conspiracy and that they were shielded from liability by the Release Agreement, the Mercy Board of Trustees ironically voted to extend Dr. Grain's provisional privileges until the summer of 1999, and subsequently granted Dr. Grain full privileges.

81.    Despite the indignities which Dr. Grain had endured, he tried to revitalize his practice. However, he soon realized that Mercy's campaign to undermine him and his practice would continue. In 2000, Dr. Grain learned that Dr. Baldwin, the Director of Mercy's Emergency Room maintained a policy of transferring all neurosurgery cases out of Mercy, and refused to refer any patients to Dr. Grain.

82.    Dr. Baldwin's improper transfer of neurosurgery patients reflected his individual bias against Dr. Grain as an African American and deprived Dr. Grain of the best source of patients to build his practice. Mercy condoned this travesty. Although Dr. Grain complained to Mercy administrators about this unlawful transfer policy, Mercy took no action in breach of their obligation to assist Dr. Grain in building a practice.

83.    In early 2000, physicians who attended various Mercy Board meetings reported to Dr. Grain that Mercy's on-going attacks on his practice were motivated by racial animus from members of the Mercy Board of Trustees against Dr. Grain and his wife, Dr. Barnes.

84.    Frustrated by the continued racial animosity directed at him Dr. Grain explored opportunities outside Mercy. In January 2001, Dr. Grain found an opportunity to start over again and to begin a neurosurgery practice in Ohio. Dr. Grain negotiated an agreement with an Ohio hospital. However, when the Ohio hospital contacted Mercy as part of Dr. Grain's credentialing

18

process, Dr. Baldwin offered a malicious, scathing and defamatory review of Dr. Grain despite the knowledge that Dr. Grain had been exonerated during his Peer Review.

85.    On information and belief, Dr. Baldwin had information concerning Dr. Grain's Peer Review, and as a direct result of Dr. Baldwin's malicious statements, the Ohio hospital broke-off negotiations with Dr. Grain shortly thereafter.  Dr. Grain has been unable to secure another position because of his relationship with Mercy.

86.    Having stifled his practice in Port Huron and prevented him from traveling elsewhere to practice, the Mercy Board began its final assault on Dr. Grain in 2002 by taking steps to end all neurosurgery at Mercy, and to drive Dr. Grain completely from practice, without any ability to go elsewhere.

87.    In the early part of 2002, Hospital administrators, including President Trimmer, convened secret meetings to discuss selling Mercy's intracranial equipment, which was essential for Dr. Grain to continue to operate and perform intracranial surgery.  Without the ability to perform such surgeries, they knew it would negatively impact Dr. Grain's skills and career.

88.    The discrimination endured by Dr. Grain became more pronounced during this time.  For example, at Dr. Grain's request, Sue Panozza, Mercy's Marketing Director, had developed a feature article for the Mercy Hospital magazine on a cancer patient that had complex neurosurgery performed by Dr. Grain.  The article boasted of the patient's amazing survival but completely and intentionally omitted not only Dr. Grain's name from the article but also his picture from the accompanying photo.  The accompanying photo included only Non-African American physicians, and not Dr. Grain.

89.    Despite Dr. Grain's earlier protests about unlawful transfers from Mercy's Emergency Room, Dr. Grain learned from one of his patients in the summer of 2002 that the

19

unlawful transfer of neurosurgery patients continued unabated. Yet again on November 4, 2002 Dr. Grain learned from a patient's family member that the improper and unlawful transfer of neurosurgery patients continued unabated. After learning about this continued unlawful conduct by Dr. Baldwin and other emergency room staff, Dr. Grain met with Mercy administrators, including President Trimmer, to complain about these illegal transfers.

90.    In December 2002, several months after raising the transfer issue with President Trimmer, Dr. Grain learned that attempts to transfer a head trauma patient had been made from Mercy's Emergency Room. This was justified by Dr. Tracy, the emergency room physician who specifically made derogatory statements about Dr. Grain to Dr. Valjee, the surgeon taking care of the patient. Dr. Tracy intentionally and maliciously refused to refer any patients to Dr. Grain with Dr. Baldwin's blessing. Dr. Grain demanded another meeting with Mercy administration; he spoke with Vice-President Dannette Hayman, and informed her that Dr. Baldwin's transfer procedures violated federal law regarding patient transfers as the patients were not made aware that Mercy offered such services.

91.    In response and retaliation, the Board of Trustees voted at its next meeting to place the intracranial program in abeyance. This decision was motivated not only by racial animus but also to retaliate against Dr. Grain for complaining about the illegal emergency room transfers.

92.    On January 15, 2003, President Trimmer wrote to Dr. Grain to officially inform him that intracranial surgeries were "on hold" at Mercy.

93.    Because of Mercy's abrupt decision to stop intracranial surgery at Mercy, Dr. Grain was forced to transfer patients and find other physicians to care for them, delaying scheduled surgeries, and placing these patients at considerable risk.

94.     After the Board's decision to stop intracranial surgery, a Board member named Dr. Marshall Kamer called Dr. Grain to discuss the Board's decision with him.  During the call, Dr. Kramer told Dr. Grain that the Board also voted to form a subcommittee to study the intracranial surgery issue and that Dr. Grain would serve as a member of the subcommittee.

95.     Dr. Kamer's promise that Dr. Grain would participate in further discussions about the future of the intracranial practice was a sham.  The subcommittee met without even informing Dr. Grain of the time or whereabouts of its meetings.  The subcommittee voted on February 3, 2003, without Dr. Grain's attendance.  The two physician representatives voted to permit intracranial surgery to continue, while the administration including Ms. Hayman, and Board representatives voted to stop intracranial surgery.  Had Dr. Grain been permitted to participate, as promised, he would have cast the deciding vote to permit intracranial surgery at Mercy.

96.     On April 9, 2003, the Board decided to permanently stop intracranial surgery, thereby ending any chance for Dr. Grain to continue a vibrant neurosurgery practice in the Port Huron area and effectively terminating his relationship with Mercy. In connection with this decision, a member of the Board of Trustees, Sister Charlotte Young, made disparaging comments about Dr. Grain, and blamed two unnamed doctors on the Board for informing Dr. Grain about the decision to eliminate intracranial surgery.  Sister Young cautioned that if these unnamed doctors had not told Dr. Grain about the decision and "let the cat out of the bag", the Board would not have had to take other actions, which, on information and belief, was the decision to close the Hospital's birthing center and inpatient pediatric unit.

### Facts Relating To Dr. Barnes

97.     Beginning in 1997, Mercy actively recruited Dr. Barnes to relocate from Fredericksburg, Virginia to Port Huron, Michigan. Dr. Barnes had a solo practice in pediatrics and was not the member or partner in any medical practice.

98.     As part of the negotiations, Mercy had a relationship with the Children's Health Care Group, as the physicians in the group had privileges at the Hospital. Mercy also told Dr. Barnes that Children's Health Care Group would provide her "call coverage." Mercy knew that "call coverage" was an important issue as Dr. Barnes had a group of physicians in Virginia that saw her patients when Dr. Barnes was not available, and vice versa. Dr. Barnes would not be able to develop an independent practice in Port Huron without Mercy's assistance.

99.     Dr. Barnes was originally reluctant to re-locate to Michigan because she wanted to continue her solo practice but based upon Mercy's representations that a solo practice would be preferred by the Hospital, that Mercy would support her, that she would have a similar practice as she had in Virginia, no worse, and that Children's Health Care Group would provide "call coverage," Dr. Barnes agreed in June 27, 1997 to terminate her successful Virginia practice and move the Port Huron after reaching a contractual agreement with Mercy. A copy of Guarantee Agreement dated June 27, 1997 is attached hereto and incorporated herein by reference as Exhibit 6.

100.    Unbeknownst to Dr. Barnes, Mercy told Children's Health Care Group that Dr. Barnes would be joining their practice, which had five physicians, and that she was not opening a solo practice in competition with them. Children's Health Care Group is the only major pediatrics practice in the Port Huron area.

101.   Sometime prior to starting her practice in May 1998, Dr. Barnes learned that Children's Health Care Group expected Dr. Barnes to join their group, and not that she would develop a solo practice.

102.   Mercy misrepresented to Dr. Barnes that Children's Health Care Group would provide call coverage as part of her solo practice, and but for this misrepresentation Dr. Barnes would not have re-located from Virginia, and Dr. Grain would not have accepted the position at Mercy.

103.   Ultimately, Children's Health Care Group agreed reluctantly to provide "call coverage" to Dr. Barnes, this placed stress upon Dr. Barnes' relationship with them as they believed she had lied to them about joining their practice.

104.   Despite the warranties and representations to help Dr. Barnes re-build her practice from "scratch," Mercy made no effort to help assimilate Dr. Barnes into the hospital or medical community of Port Huron, and failed to honor its Agreement.

105.   Thereafter, Mercy also interfered with Dr. Barnes' practice by helping Children's Health Care Group to establish a competing pediatrics practice in the office down the street from Dr. Barnes' office.  On belief, Mercy did this as part of some backdoor agreement with Children's Health Care Group to provide "call coverage" for Dr. Barnes.

106.   The attempt to harm Dr. Barnes' practice was part of the same concerted conspiracy orchestrated by members of the Mercy administration and Board of Trustees to discriminate against Dr. Grain on the basis of his race and to destroy his neurosurgery practice, once they realized that they did not want either Dr. Grain or Dr. Barnes practicing at their Hospital.

107.    Only days after Mercy coerced and extorted Dr. Grain to sign a release of his income guarantee in February 1999, Mercy took punitive actions against Dr. Barnes. Mercy unilaterally changed its Agreement with Dr. Barnes and factored in fifteen thousand dollars ($15,000) due Dr. Barnes under the Guaranteed Income Agreement into the "funds owed", and in doing so, Mercy breached the Agreement. Mercy then unilaterally converted Dr. Barnes' contract from a net income guarantee contract into a gross income guarantee contract by refusing to reimburse Dr. Barnes for expenses which Mercy was contractually obligated to pay.

108.    When challenged about these unlawful contractual breaches, Mercy responded that it had already paid Dr. Barnes enough for someone practicing pediatrics.

109.    Because of Mercy's predominantly successful attempts to destroy her husband's practice, Dr. Barnes has been forced to use funds from her practice to cover Dr. Grain's labor costs, rent and supplies.

### Count I -- 42 U.S.C. §1981
### (Dr. Grain v. All Defendants)

110.    Dr. Grain re-alleges and re-avers each of the allegations contained in Paragraphs 1-109 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

111.    The Defendants, jointly and severally, intentionally discriminated against Dr. Grain on the basis of his race.

112.    The above-described actions taken against Dr. Grain because of his race had the purpose or effect of discriminating against him in the enjoyment of all benefits, privileges, terms, and conditions of his contractual relationship with Mercy.

113.    In willfully, maliciously and in bad faith violating Dr. Grain's clearly established contractual rights as set forth herein, Defendants, jointly and severally, are liable to Dr. Grain for

compensatory and punitive damages, in an amount to be assessed and determined at trial plus interest, costs and attorneys' fees.

## Count II -- 42 U.S.C. §1395dd(i)
### (Dr. Grain v. Trinity Health, Mercy)

114.    Dr. Grain re-alleges and re-avers each of the allegations contained in Paragraphs 1-113 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

115.    Dr. Grain protested to Mercy administrators, including President Trimmer, concerning the illegal transfer of patients from Mercy's Emergency Room in violation of 42 U.S.C. §1395dd.

116.    Mercy retaliated against Dr. Grain for his Verified Complaints by preventing Dr. Grain from continuing to conduct intracranial surgery at Mercy.

117.    Mercy's retaliatory actions caused Dr. Grain substantial economic losses, entitling him to damages, in an amount to be assessed and determined at trial plus interest, costs and attorneys' fees.

## Count III -- Breach Of Contract
### (Dr. Grain v. Trinity Health And Mercy)

118.    Dr. Grain re-alleges and re-avers each of the allegations contained in Paragraphs 1-117 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

119.    Dr. Grain and Mercy were parties to the Guarantee Agreement.

120.    The Defendants, jointly and severally, discriminated against Dr. Grain because of his race, worked to undermine his neurosurgery practice by using the Peer Review process as a guise to coerce and extort a release from the Guarantee Agreement. Such acts and conduct breached the Agreement.

121.   Dr. Grain suffered financial damage resulting from Defendants', jointly and severally, breach(es) of contract, in an amount to be assessed and determined at trial plus interest, costs and attorneys' fees.

### Count IV -- Breach Of The Implied Covenant Of Good Faith And Fair Dealing
### (Dr. Grain v. Trinity Health And Mercy)

122.   Dr. Grain re-alleges and re-avers each of the allegations contained in Paragraphs 1-121 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

123.   Dr. Grain and Mercy were parties to a Guarantee Agreement.

124.   The Defendants, jointly and severally, deprived Dr. Grain of the fruits of this contract by orchestrating a conspiracy to force Dr. Grain's release of all obligations under the Guarantee Agreement and by compelling him, through the use of threats, to make contractual concessions to Mercy while under duress.

125.   Mercy's coercive conduct violates the implied covenant of good faith and fair dealing implicit in every contract.

126.   Dr. Grain suffered financial damage resulting from Defendants', jointly and severally, breach(es) of the implied covenant of good faith and fair dealing, in an amount to be assessed and determined at trial plus interest, costs and attorneys' fees.

### Count V -- Misrepresentation
### (Dr. Grain v. Trinity Health and Mercy)

127.   Dr. Grain re-alleges and re-avers each of the allegations contained in Paragraphs 1-126 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

128.   Mercy misrepresented to Dr. Grain that it would support the development of a neurosurgical practice, and made other associated warranties and representations.

129.    Dr. Grain relied upon such representations to his detriment, and moved his professional practice and family from Virginia to Port Huron, Michigan.

130.    Mercy knowingly and intentionally failed to assist Dr. Grain in building a practice, and, in fact, took steps to hinder and damage his career.

131.    Dr. Grain has been damaged by the misrepresentations, acts and conduct, in an amount to be assessed and determined at trial plus interest and costs.

### Count VI -- Intentional Interference With Business Relations
### (Dr. Grain v. All Defendants)

132.    Dr. Grain re-alleges and re-avers each of the allegations contained in Paragraphs 1-131 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

133.    Dr. Grain maintained valid business expectancies with patients in the Port Huron area in need of neurosurgery services.

134.    Each of the Defendants, jointly and severally, had knowledge that Dr. Grain maintained these valid business expectancies with prospective patients.

135.    The intentional acts of the Defendants, jointly and severally, undermined Dr. Grain's valid business expectations with prospective patients and were wrongful and/or improper in their means and motives because said acts were made in bad faith, with malice, with a race based discriminatory animus, and were otherwise improper.

136.    Dr. Grain suffered financial damages as a result of Defendants', jointly and severally, intentional interference, jointly and severally, with his business expectancies, in an amount to be assessed and determined at trial plus interest, costs and attorneys' fees.

### Count VII -- Intentional Interference With Contractual Relations
### (Dr. Grain v. President Trimmer, Dr. Chafte, Dr. Velardo, and Dr. Baldwin)

137.    Dr. Grain re-alleges and re-avers each of the allegations contained in Paragraphs 1-136 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

138.    Dr. Grain had maintained a valid Guarantee Agreement with Mercy.

139.    The intentional acts of President Trimmer, Dr. Chafte, Dr. Velardo and Dr. Baldwin resulted in the breach of Mercy's Guarantee Agreement with Dr. Grain and were wrongful or improper in their means and motives because said acts were made in bad faith, with malice, with a race based discriminatory animus, and were otherwise improper.

140.    Dr. Grain suffered financial damages as a result of Defendants' intentional interference, jointly and severally, with his Income Guarantee contract with Mercy, in an amount to be assessed and determined at trial plus interest, costs and attorneys' fees.

### Count VIII -- Libel And Slander
### (Dr. Grain v. Dr. Baldwin, Dr. Velardo, Trinity Health and Mercy)

141.    Dr. Grain re-alleges and re-avers each of the allegations contained in Paragraphs 1-140 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

142.    The above-described written and oral publications made by Dr. Baldwin and Dr. Bernard Velardo, which were adopted, authorized, and/or ratified by Mercy, were defamatory in that they tended to hold Dr. Grain up to contempt, hatred, scorn, and/or ridicule, and further tended to impair Dr. Grain's standing in the medical community, and elsewhere.

143.    The above-described written and oral communications made by Dr. Baldwin and Dr. Velardo, were of, and concerning Dr. Grain because they referred to Dr. Grain and/or could reasonably be interpreted as referring to Dr. Grain.

144.    Dr. Baldwin and Dr. Velardo both knew that their publications regarding Dr. Grain were false, said publications were in fact false, and Dr. Baldwin and Dr. Velardo acted with malice and in bad faith in publishing said statements and/or they acted with reckless disregard regarding the truth or falsity of said statements.

145.    The above-described publications by Dr. Baldwin and Dr. Velardo have been ongoing and continuing and many individuals have relied upon such statements, and the statements have continued to damage Dr. Grain's career.

146.    The above-described publications by Dr. Baldwin and Dr. Velardo charged Dr. Grain with being incompetent in his professions and prejudiced him in his business. These publications are slanderous and libelous *per se*, in an amount to be assessed and determined at trial plus interest, costs and attorneys' fees.

### Count IX -- Civil Conspiracy
### (Dr. Grain v. All Defendants)

147.    Dr. Grain re-alleges and re-avers each of the allegations contained in Paragraphs 1-146 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

148.    President Trimmer, Dr. Baldwin, Dr. Chafte, and other members of Mercy's administration combined to accomplish an unlawful purpose, or a purpose not unlawful by unlawful means. Namely, this purpose was to drive Dr. Grain from his good standing in the medical community and to destroy his medical practice by the use of methods that violate various statutes and the common law as described-above.

149.    President Trimmer, Dr. Baldwin and other Mercy administrators possessed some particular power of coercion which, standing individually, they would not have had.

150.    Dr. Grain has been damaged by the acts and conduct of President Trimmer, Dr. Chafte, Mercy, and the other Defendants, jointly and severally,  in an amount to be assessed and determined at trial plus interest, costs and attorneys' fees.

### Count X -- Misrepresentation
### (Dr. Barnes v. Mercy)

151.    Dr. Barnes re-alleges and re-avers each of the allegations contained in Paragraphs 1-150 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

152.    Mercy knew that any agreement with Dr. Grain was contingent on Dr. Barnes also agreeing to relocate her solo pediatrics practice from Virginia.

153.    Dr. Barnes told Mercy that she would not agree to relocate with her husband and minor children unless she was able to establish a solo practice.

154.    Mercy misrepresented to Dr. Barnes in order to induce her to agree to relocate with Dr. Grain that Children's Health Care Group would provide "call coverage," and Mercy would support the development of her practice.

155.    Dr. Barnes relied upon Mercy's representations concerning Children's Health Care Group in agreeing to relocate only to find out after moving to Port Huron that Children's Health Care Group expected her to join their practice, and they would not provide "call coverage" otherwise.

156.    Mercy's actions caused immediate harm and damage to Dr. Barnes' career, including her relationship with the physicians at Children's Health Care, and caused delay in her being able to establish a practice.

157.    But for Mercy's misrepresentations, Dr. Barnes would not have entered into the Guarantee Agreement and relocated to Port Huron.  Dr. Barnes has been damaged by Mercy's misrepresentations in an amount to be assessed and determined at trial.

## Count XI -- Breach Of Contract
### (Dr. Barnes v. Trinity Health and Mercy)

158.    Dr. Barnes re-alleges and re-avers each of the allegations contained in Paragraphs 1-157 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

159.    Dr. Barnes and Mercy entered into a Guarantee Agreement dated June 27, 1997.

160.    The Defendants, jointly and severally,  breached the Agreement by working to undermine her pediatrics practice, by failing to support the development of her practice, by assisting other parties in developing competing practices, and by failing to pay monies due in breach the Guarantee Agreement.

161.    Dr. Barnes suffered financial damage resulting from Defendants', jointly and severally,  breach of contract, in an amount to be assessed and determined at trial plus interest, costs and attorneys' fees.

## Count XII -- Interference With Business Relations
### (Dr. Barnes v. Trinity Health and Mercy)

162.    Dr. Barnes re-alleges and re-avers each of the allegations contained in Paragraphs 1-161 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

163.    Dr. Barnes maintained valid business expectancies with patients in the Port Huron area in need of pediatric services.

164.    The Defendants, jointly and severally,  had knowledge that Dr. Barnes maintained these valid business expectancies with prospective patients.

165.    The intentional acts of the Defendants, jointly and severally, undermined Dr. Barnes' valid business expectations with prospective patients and were wrongful and/or improper in their means and motives because said acts were made in bad faith, with malice and were otherwise improper.

166.    Dr. Barnes suffered financial damages as a result of Defendants' intentional interference, jointly and severally, with her business expectancies, in an amount to be assessed and determined at trial plus interest, costs and attorneys' fees.

### Count XIII -- Loss of Consortium
### (Dr. Barnes v. All Defendants)

167.    Dr. Barnes re-alleges and re-avers each of the allegations contained in Paragraphs 1-166 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

168.    Dr. Barnes has suffered a loss of companionship, love, and affection from Dr. Grain as a result of the Defendants', jointly and severally,  acts and conducts.

169.    Dr. Barnes has been damaged in an amount to be assessed and determined at trial plus interest, costs, and attorney fees.

### Count XIV -- Civil Extortion
### (Dr. Grain v. President Trimmer and Mercy)

170.    Dr. Grain re-alleges and re-avers each of the allegations contained in Paragraphs 1-169 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

171.    M.C. L. §750.213 provides that, "[a]ny person who shall, either orally or by a written or printed communication, maliciously threaten ... any injury to the person or property ... with intent thereby to extort money or any pecuniary advantage whatever, or with the intent to compel the person so threatened to do or refrain from doing any action against his will."

172.    Under Michigan law, a threat of danger to one's reputation is a threat of injury to the person and this also includes emotional injuries.

173.    Under Michigan law, the threat to one's reputation to extort money from that person, and where the person making the threat receives a pecuniary (or monetary) advantage from that threat violates the statute.

174.    Under Michigan law, even if Mercy believed it was enforcing contract rights it had against Dr. Grain, it could not make malicious threats to injure Dr. Grain's career as a condition of avoiding an obligation to pay money to Dr. Grain.

175.    At the time Mercy ordered a Peer Review of Dr. Grain, Mercy had already (i) accused him of being in breach of the Guarantee Agreement that was paying Dr. Grain $400,000 per year, and (ii) demanded that Dr. Grain perform more surgeries.

176.    Dr. Chafte, Mercy, President Trimmer, and Mr. Goldenbogen initiated the Peer Review in order to use the process and results therefrom to force Dr. Grain to relinquish his guarantee of $400,000 in salary in year two, and $380,000 in year three ("Guaranteed Income"), plus bonuses.

177.    When Mercy and President Trimmer learned that Dr. Grain would be cleared of any misconduct in the Peer Review, they devised another path to force Dr. Grain to relinquish the Guaranteed Income by advising Dr. Grain that his privileges at the Hospital would be suspended or terminated if he refused to relinquish the Guaranteed Income.

178.    President Trimmer, Mr. Goldenbogen, and Ms. Salo all told Dr. Grain that the Board would look favorably on his request for privileges if he relinquished all rights under the Guarantee Agreement, and if he did not, he would lose his privileges at Mercy.

179.   President Trimmer, Mr. Goldenbogen, Ms. Salo and Mercy knew or should have known that Mercy's suspension or termination of Dr. Grain's privileges would cause irreparable harm to his eighteen-year career as a neurosurgeon, and make it nearly impossible for him to continue practicing anywhere in the country as a neurosurgeon.

180.   When Dr. Grain refused to bargain with Mercy and President Trimmer, President Trimmer enlisted the help of Dr. Valjee who she knew to be a close friend of Dr. Grain. President Trimmer urged Dr. Valjee to explain to his friend, Dr. Grain, that it would be in Dr. Grain's best interests to sign out of the Guarantee Agreement. In January 1999 and in order to exert additional pressure on Dr. Grain, President Trimmer called Dr. Krishna Valjee, the former Chief of Staff and Chief of Surgery at Mercy Hospital, out of surgery and urged Dr. Valjee to explain to his friend, Dr. Grain, that it would be in his best interests to sign out of the Guaranteed Agreement. Dr. Valjee was insulted by the request to coerce Dr. Grain and told President Trimmer that he would be sure to tell Dr. Grain of this meeting. Dr. Valjee advised Dr. Grain of the meeting and the long lasting and immeasurable damage to this professional reputation if he lost his privileges.

181.   Following the threats to Dr. Grain by Mercy, President Trimmer, Dr. Chafte, Ms. Salo and Mr. Goldenbogen that he would lose his privileges if he did not release his rights under the Guarantee Agreement, other doctors at the Hospital including Dr. B.R. Reddy advised Dr. Grain to relinquish his Guarantee Income and rights under the Guarantee Agreement. Dr. Coury advised Dr. Grain that his career would be damaged if he lost his privileges.

182.   The actions taken by President Trimmer, Mr. Goldenbogen, Ms. Salo and Dr. Chafte were done with full knowledge that Dr. Grain had in fact been cleared of any alleged claim of misconduct in the Peer Review, and the threats to suspend or terminate his privileges

34

were malicious, intentional, and designed to extort from Dr. Grain the financial benefits under the Guarantee Agreement for the financial benefit of Mercy.

183.    Mercy extorted from Dr. Grain the benefits due to him under the Guarantee Agreement by forcing him to sign the February 2, 1999 Agreement. Dr. Grain lost the Income Guarantee, was forced to work on a fee for service basis in which Dr. Grain made considerable less money, and received no benefit from signing the February Agreement.

184.    Dr. Grain has been damaged by the acts and conduct of Mercy, and President Trimmer in an amount to be assessed and determined at trial plus interest, costs and attorneys' fees.

### Count XV -- Economic Duress
### (Dr. Grain v. Mercy, President Trimmer)

185.    Dr. Grain re-alleges and re-avers each of the allegations contained in Paragraphs 1-184 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

186.    The threats of Mercy, President Trimmer, Dr. Chafte, Ms. Salo and Mr. Goldenbogen to Dr. Grain that his career as a neurosurgeon would be ruined if he did not release his rights to the Guaranteed Income of $780,000 for year two plus bonuses is an illegal act.

187.    Dr. Grain received no benefit from releasing Mercy under the Guarantee Agreement, and Dr. Grain only did so in order to prevent his career of eighteen-years from being ruined by the suspension or termination of his privileges without any basis or cause by Mercy.

188.    The performance of unnecessary surgical procedures would have required Dr. Grain to knowingly file a false statement for the purpose of seeking payment under a federal health care plan in violation of 42 USCS §1320(a)(1), and (a)(4), and §1320(b)(1)(A).

35

189.    When Dr. Grain refused to perform unnecessary surgical procedures to increase the profitability of the newly formed neurological practice, Mercy, President Trimmer, Dr. Chafte, Mr. Goldenbogen and Ms. Salo took actions to retaliate against Dr. Grain in the guise of a Peer Review, made threats to suspend his privileges, thereafter terminated neurosurgery at the Hospital, and took actions designed to prevent Dr. Grain from seeking opportunities elsewhere.

190.    Dr. Grain is entitled under Michigan law to set aside the February 1999 Agreement, and is entitled to recover from Mercy and President Trimmer the sum of $780,000 plus interest, costs and attorneys' fees.

191.    Dr. Grain has been further damaged by the acts and conduct of Mercy and President Trimmer including expected profits from developing his practice in an amount to be assessed and determined at trial plus interest, costs and attorneys' fees.

### Count XVI -- Rescission of Release Agreement
### (Dr. Grain v. Trinity Health and Mercy)

192.    Dr. Grain re-alleges and re-avers each of the allegations set forth in Paragraphs 1-191 of the Verified Complaint and incorporates them by reference as if separately set forth herein.

193.    Mercy did not provide any consideration to Dr. Grain in connection with his execution of the February 1999 Release Agreement.

194.    Dr. Grain received no benefit from executing the February 1999 Release Agreement as he had been cleared in November 1999 under the Peer Review.

195.    The February 1999 Release Agreement is void for want of consideration and because the execution was procured through coercion and extortion.

196.    Dr. Grain is entitled, in equity, to the rescission of the February 1999 Release Agreement.

## PRAYERS FOR RELIEF

WHEREFORE, the Plaintiffs, Peter G. Grain, M.D. and Annette Barnes, M.D., jointly and severally,  move this Court as follows:

1.    That Judgment enter in favor of the Plaintiff, Peter G. Grain, M.D., and against the respective Defendants, jointly and severally, under Counts I, II, III, IV, V, VI, VII, VIII, IX, and XIV of the Verified Complaint in an amount to be assessed and determined at trial plus interest, costs, and attorneys' fees.

2.    That Judgment enter in favor of the Plaintiff, Peter G. Grain, M.D., and against the respective Defendants, jointly and severally, under Count XIV and/or Count XVI of the Verified Complaint and further that an Order and/or Declaration be entered that February 1999 Release Agreement is null and void, and of no effect.

3.    That Judgment enter in favor of the Plaintiff, Annette Barnes, M.D., and against the respective Defendants, jointly and severally, under Counts X, XI, XII, and XIII of the Verified Complaint in an amount to be assessed and determined plus interest, costs, and attorneys' fees.

that the court enter such other and further relief as the court deems just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs, Peter G. Grain, M.D. and Annette Barnes, M.D., jointly and severally, demand a jury trial on all issues so triable.

## VERIFICATION

WE HAVE READ THIS VERIFIED COMPLAINT AND THE FACTUAL STATEMENTS

CONTAINED HEREIN WHICH ARE TRUE AND ACCURATE TO THE BEST OF OUR

INFORMATION, KNOWLEDGE AND BELIEF.

_____
Dr. Peter G Grain

_____
Dr. Annette Barnes

On this June 26, 2003, Dr. Peter Grain and Dr. Annette Barnes, appeared before me and verified

the allegations contained in the above Second Amended Complaint,

__St. Clair_____ County, State of Michigan

_____
(Notary Public)
                    BARBARA J. FOSGARD
                    Notary Public, St. Clair County, Mich.
My Commission expires:  My Commission Expires 12-27-2003

Respectfully submitted,

PETER G. GRAIN, M.D. and ANNETTE BARNES,
M.D.

By their attorneys,

E. Macey Russell / by consent / EMR 6-26-03
_____
E. Macey Russell (MA BBO # 542371)
Gregory C. Keating (MA BBO # 564523)
CHOATE, HALL & STEWART
53 State Street
Boston, MA 02019
(617) 248-5000

Elmer L. Roller  P 23592
1760 S. Telegraph Rd.
Suite 300
Bloomfield Hills, MI 48302-0183
(248) 335-5000

Dated: June 26, 2003

# INCOME GUARANTEE AGREEMENT

**THIS INCOME GUARANTEE** is made this 2 7 day of _June_ , 1997 by and between **Mercy Health Services**, a Michigan nonprofit corporation d/b/a **Mercy Hospital-Port Huron** (the "Hospital"), and **Peter G. Grain M.D.**, a Michigan resident (the "Physician").

## RECITALS:

**A.** Hospital has identified a need for quality neurosurgery services in the Hospital's service area as part of its integrated health care delivery system. Hospital has also identified a need for additional physician coverage in its emergency room. Hospital has determined that in furtherance of its community obligation and charitable purposes it should recruit a neurosurgeon to its service area in order to provide local community coverage of this needed specialty.

**B.** Hospital, in order to so recruit and attract such a neurosurgeon, has explored several alternatives regarding the recruitment and retention of a neurosurgeon and has determined that the only feasible method to accomplish these goals is through the use of recruitment incentives including, but not limited to, providing financial assistance with the cost associated with the establishment of a neurosurgery practice (the "Practice") in the St. Clair County Community.

**C.** Hospital has considered the alternatives and, after thorough evaluation by a special committee of its Board of Directors, has determined and concluded that the incentives and assistance provided for in this Agreement are reasonable and appropriate given the initial cost associated with starting up a neurosurgery surgeon in the Hospital's service area.

**D.** The Physician is willing to make a long term commitment to provide medical services in the Hospital's service area which will help alleviate the existing and projected shortage of neurosurgeons in the Hospital's service area.

**NOW, THEREFORE,** in consideration of the above recitals, the mutual covenants and promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged and agreed to, Physician and Hospital agree as follows:

**1.** **Definitions.** The terms set forth below shall, for purposes of this Agreement, have the meanings set forth in this Section 1 when such terms appear capitalized. Other capitalized terms used in this Agreement shall have the meanings set forth in the applicable sections of this Agreement.

**1.1** **Net Practice Income.** Net Practice Income shall equal the revenues generated by the Practice less the reasonable and customary Professional Expenses necessary to conduct the Practice during the term of this Agreement. The amount of the

revenues of the Practice and the Professional Expenses shall be determined on a full accrual basis in accordance with generally accepted accounting principals Notwithstanding the foregoing, the Practice's expense for bad debts and contractual allowances shall be adjusted on the Due Date to accurately reflect the uncollected revenues of the Practice during the Term.

   1.2 **Professional Expenses.** Professional Expenses includes fixed and variable expenses which are directly allocable and normally and reasonably associated with the operation of the Practice and which are typically deemed to be deductible business expenses pursuant to the provisions of the Internal Revenue Service Code of 1986 as amended (the "Code"). Notwithstanding any term or condition contained herein to the contrary, Professional Expenses shall not include (i) the cost of capital items which under generally accepted accounting principles would be capitalized rather than expensed, (ii) the salaries, fringe benefit expenses or other compensation or benefit payments made by the Practice to the Physician or any other physician employees of the Practice, and (iii) any rent, service or other fees, costs or expenses paid or incurred by the Practice to any person or entity related to the Physician or the Practice in a manner described in Section 267 of the Code.

   2. **Income Guarantee.**  Hospital agrees, upon the terms and conditions contained herein, to provide the Physician a three year income guarantee including cash bonuses( as defined in section Eight 8) of $400,000 for Years One and Two,and $ 380,000 for year Three  (the "Income Guarantee Amount"). The Income Guarantee Amount shall be advanced by the Hospital to the Physician on a monthly basis (the "Income Guarantee Advances"). The amount of each Income Guarantee Advance shall be equal to the sum of (i) ~~Thirty-Two Thousand ($32,000)~~ Dollars (ii) plus an estimate of  the expenses of the Practice for one month to be mutually agreed upon by the Hospital and Physician (iii) less the  cash collections of the Practice's revenues during the preceding month.  Two months  of Income Guarantee Advances ,will be given upon first day of practice by the Hospital and shall  continue thereafter on the first day of the second month and each month of the Term until the total of the Income Guarantee Advances equals the Income Guarantee Amount.  Notwithstanding any term or condition contained herein to the contrary, the Hospital shall not be obligated to make any Income Guarantee Advance to the Physician (i) if the amount of such Income Guarantee Advance combined with the total of all previous Income Guarantee Advances would exceed the Income Guarantee Amount or (ii) subsequent to the termination of this Agreement.

   3. **Payment and Repayment of Income Guarantee Amount.**  On the date the Term expires, Hospital shall calculate the Net Practice Income, subject to adjustment on the Due Date for bad debt expense and contractual allowances as provided in Section 1.1 of this Agreement, of the Practice for the Term.  The Hospital's obligation to make a further payment to Physician of a portion of the Income Guarantee Amount and Physician's obligation to repay the amount of the Income Guarantee Advances shall be determined as follows:

**3.1** **Net Practice Income Less Than Income Guarantee Amount.** In the event Net Practice Income for the Term is less than the Income Guarantee Amount (the "Deficiency"), Hospital will make a final cash payment to Physician in an amount equal to: (i) the Deficiency, minus (ii) the amount of the Income Guarantee Advances previously made by Hospital to Physician pursuant to Section 2 of this Agreement.  If the deficiency is less than the amount of the previous Income Guarantee Advances the Hospital shall not make any further payment to Physician.  Physician agrees to repay to Hospital the total of the amount paid by the Hospital pursuant to this Section 3.1 plus the amount of all previous Income Guarantee Advances, together with interest accruing at a rate of two (2%) percent over NBD Bank, N.A.'s (Port Huron) prime lending rate, in thirty-six (36) equal monthly installments (the "Installments") beginning on the first day of the thirteenth (13th) month following the month in which the Term expires. No interest shall accrue until the first day of such 13th month.  Physician agrees to execute a Promissory Note, satisfactory in form and content to Hospital's legal counsel, on the date the Term expires to evidence his obligation to pay the Installments.  Should Physician fail or refuse to execute and deliver this Promissory Note then this Agreement shall serve as sufficient evidence of his obligation to pay the Installments.  Notwithstanding any term or condition contained herein to the contrary, Hospital agrees to forgive and discharge, on a monthly basis, each Installment so long as Physician continues to practice full-time medicine in the Hospital's service area and remains a member in good standing of the Hospital's medical staff. Hospital agrees the Physician can pay with a credit card acceptable to Hospital.

**3.2** **Net Practice Income Exceeds the Income Guarantee Amount.** If the Net Practice Income of the Practice for the Term exceeds the Income Guarantee Amount, Physician agrees to repay to the Hospital an amount equal to the total of all previous Income Guarantee Advances (the "Repayment Amount").  The Repayment Amount will be due on the date (the "Due Date") one year from the expiration of the Term.  Physician agrees that if he  fails to pay the Repayment Amount on the Due Date it shall begin, as of the Due Date, to accrue interest at a rate equal to NBD Bank, N.A.'s (Port Huron) prime lending rate plus two (2%) percent.  Physician agrees to execute and deliver to the Hospital, on the date the Term expires, a Promissory  Note, in form and content satisfactory to Hospital's legal counsel, to evidence his obligation to pay to the Hospital the Repayment Amount.  If Physician fails or refuses to execute or deliver this Promissory Note then this Agreement shall serve as evidence of his obligation to pay to the Hospital the Repayment Amount. Hospital agrees the Physician can pay with a credit card acceptable to Hospital.

**3.3** **Income Guarantee Advances Due in Full Immediately.** Notwithstanding any term or condition contained herein to the contrary, Physician agrees that the amount of all Income Guarantee Advances shall become immediately due and payable to Hospital, without any notice or demand by Hospital, upon the happening of any of the following events:  (a) Hospital terminates this Agreement for cause pursuant to Section 6.2 of this

Agreement, (b) Physician unilaterally terminates this Agreement prior to the expiration of the Term, or (c) Physician breaches any term or condition contained in this Agreement.

4.    **Dispute Resolution.**    Any disputes involving the interpretation, breach or enforcement of this Agreement which cannot be resolved by Hospital and Physician shall be resolved by binding arbitration in accordance with the rules of the American Arbitration Association.  The prevailing party shall be awarded his/its costs, including actual attorney fees. The arbitration panel or sole arbitrator, as may be applicable, shall consist of at least one certified public accountant.  Decisions of the arbitration panel will be binding on both Hospital and the Physician.

5.    **Covenants of Physician.**  Notwithstanding any term or condition contained herein to the contrary, the Hospital's obligation to make any Income Guarantee Advance to the Physician is subject to the Physician's continuing fufillment of the following covenants:

5.1    **Establishment of Practice.**  Physician shall relocate to the Port Huron area and shall diligently undertake to establish the Practice in a location which is within a one (1) mile radius of the Hospital.  Notwithstanding any term or condition contained herein to the contrary, Physician agrees to establish the Practice as required herein by September 1, 1997.

5.2    **Licensure and Certification.**  Physician shall be duly licensed to practice medicine in the State of Michigan and shall maintain such licensure at all times during the term of this Agreement.

5.3    **Medical Staff Membership.**  Physician shall become and, at all times during the term of this Agreement, remain a member in good standing of the Medical Staff of Hospital in a category other than temporary or consulting with all the privileges and subject to all the Medical Staff Bylaws and Rules and Regulations.

5.4    **Independent Contractor Status.**  It is expressly acknowledged and understood by the parties that nothing in this Agreement is intended nor shall be construed to create any employer/employee relationship, joint venture relationship, or to allow Hospital the right to exercise any control or direction over the manner or method by which Physician performs the services in connection with the Practice under this Agreement. Physician understands and agrees that Hospital will not withhold on behalf of Physician any sums for income tax, unemployment insurance, Social Security or other withholding pursuant to any law, requirement or any other governmental body relating to Physician, or make available to Physician any benefits afforded to employees of Hospital.  All such payments, withholdings and benefits, if any, are the sole responsibility of Physician and Physician will indemnify and hold Hospital harmless from and against any and all claims

that Hospital is or was responsible for the payment or filing of any of the foregoing payments, withholdings, contributions, taxes and relevant documents and returns.

**5.5    Insurance.**  Physician agrees to obtain and maintain professional liability insurance which will cover all claims related to or arising from services provided by Physician in a minimum amount of One Million ($1,000,000) Dollars per claim and Three Million ($3,000,000) Dollars in the aggregate.  Physician shall, from time to time upon the request of Hospital, provide written proof of such professional liability insurance to Hospital for Physician during the term of this Agreement.

**5.6    Reimbursement Participation.**  Physician shall be a participant for reimbursement purposes in Blue Cross/Blue Shield of Michigan, Medicare, Medicaid, and such other third party payors and managed health plans, e.g. CareChoices, Health Alliance Plan, SelectCare etc., excepting those plans which have commercial rates no lower than 110% of Medicare RBRVS, as the parties shall mutually agree upon as deemed necessary to benefit the community.

**5.7    Access to Records.**  To the extent that Section 952 of the Omnibus Reconciliation Act of 1980 (the "Act") and the regulations promulgated thereunder are applicable to this Agreement, Physician, when receiving from Hospital $10,000 or more in any twelve month period, shall, until four years after the expiration of the services provided hereunder, comply with the requests made by the Comptroller General, the Secretary of the Department of Health and Human Services, and their duly authorized representatives for access, in accordance with Section 952 of the Act, to any contract or agreement between Physician and Hospital for services and to any contract or agreement between Physician and any related organizations or physicians, as well as the books, documents, and records of Physician and such related organizations or physicians which are necessary to verify the costs of the services provided, when such were received from Hospital.  Physician shall indemnify and hold harmless Hospital if any amount of reimbursement is denied or disallowed because of the failure of Physician to comply with the obligations of this Section.  Such indemnity shall include, but not be limited to, the amount of reimbursement denied or disallowed, plus any interest, penalties and legal costs.

**5.8    Audit of Physician's Books and Records.**  Upon the request of and notice by Hospital, but not less than monthly, Physician agrees to permit the agents and employees of Hospital to review and take extracts from Physician's books and records during normal business hours at mutually convenient times pertaining to the Practice during the Term.

**5.9    Other Activities.**  Physician shall act with utmost good faith and loyalty with regard to Hospital, including, but not limited to, the following:

       5.9.1 Maintain a good working relationship with the Hospital's Medical Staff and Administration to the best of their ability; and

       5.9.2 Participate and promote the Hospital's charitable purpose and community welfare to the best of his ability, providing this responsibility does not materially interfere with the Practice.

    **5.10 Lack of Restriction.** The parties acknowledge that nothing contained in this Agreement, or implied, shall (1) make the benefits of this Agreement conditioned upon the referral of patients to Hospital; (2) prevent Physician from establishing staff privileges at, providing services in, or making referrals to any other hospital; (3) prevent the admission of patient in any other facility for the convenience of the patient or as a result of preference of patient; or (4) otherwise make conditional the benefits and provisions of this Agreement.

## 6. Term and Termination.

    **6.1 Term.** Unless terminated earlier pursuant to Section 6.2, the term of this Agreement (the "Term") shall be for a period commencing on _____, 1997, and ending on _____, ~~1998~~ 2000 P.S.

    **6.2 Termination.** This Agreement may be terminated by Hospital at any time for "cause." For purposes of this Agreement "cause" shall mean the following:

       6.2.1 Physician's failure to maintain his license to practice medicine;

       6.2.2 Physician's failure to maintain staff privileges at Hospital;

       6.2.3 A breach by Physician of any covenants contained in this Agreement which are not remedied to the satisfaction of Hospital within twenty (20) days following such breach;

       6.2.4. The cancellation of Physician's professional liability insurance coverage required to be maintained by Section 5.5 of this Agreement;

       6.2.5 Physician's conviction for violation of any criminal statute.

    **7. Equipment.** Hospital agrees to spend approximately Seven Hundred Fifty Thousand ($750,000) Dollars for the purchase certain medical equipment including, but not limited to those items of medical equipment listed on the attached Exhibit A (the "Equipment"). Physician acknowledges that the Equipment is and shall remain the property of the Hospital at all times.

1741EE2.167 - 6/12/97

8.     **Bonuses.**  In consideration of  Physician entering into this Agreement, hi
performance of his covenants contained herein and relocating to, establishing and maintaining th
Practice in the Hospital's Service Area as provided herein Hospital agrees to pay to Physician, o
on Physician's behalf, the following amounts (collectively referred to herein as the "Bonuses" an
any bonuses do not need to be considered in the Income Guarantee Advance Repayments): (i) i
the physician signs by ~~June 15,~~ 1997 and agrees to locate by August 3, 1997 hospital will provide
an additional $10,000 in bonuses (ii) a signing bonus equal to Thirty-Five Thousand ($35,000
Dollars; (iii) a  relocation bonus in the amount of Fifteen Thousand ($15,000) Dollars, (iv) two
(2) season tickets to the Detroit Pistons home games each year of term; and (v) air fare for two
individuals and two (2) tickets to one home game of the Chicago Bulls scheduled at Mercy
Hospital's discretion each year of term, to be paid to the Physician.  Notwithstanding any term o
condition contained herein to the contrary, Physician agrees that if the Practice is not maintained
in the Hospital's service area from the date of this Agreement until _____, 200¢ he
will immediately repay to the Hospital a prorata portion, based on the number of months
remaining between the date the Practice is terminated and _____, 200¢, of the total
amount of the Bonuses.                                                         2001 P.D. /M

9.     **Hospital Appointment.**  Hospital agrees that upon Physician's credentialling and
appointment as Director of Neurosurgery ~~and Stroke Management~~ of the Hospital  (the
"Appointment") it will pay to Physician Fifty-Four Thousand ($54,000) Dollars as reimbursement
for the significant start-up expenses he will incur and services he will provide in establishing a
Neurosurgery Department.  Beginning one (1) year after the Appointment Hospital agrees to
compensate Physician at a rate of Twelve Thousand ($12,000) Dollars per year, to be paid
annually, for Physician's services as Director of Neurosurgery.

10.     **Equipment Line of Credit.**  During the Term, if no default or breach of this
Agreement or any Promissory Note entered into in connection with this Agreement has occurred,
Hospital agrees to make available to Physician for purchases of medical equipment for use in the
Practice a line of credit (the "Equipment Line of Credit"). The maximum amount of all advances
made by the Hospital pursuant to the Equipment Line of Credit shall not exceed Fifty Thousand
($50,000) Dollars.  The Hospital shall only be obligated to advance funds pursuant to the
Equipment Line of Credit to Physician upon its receipt of a satisfactory description, including
supporting documents, e.g. invoices, purchase orders, etc., of the medical equipment to be
purchased for use in the Practice with such advance(s).  Physician agrees to repay the amount of
all advances made pursuant to the Equipment Line of Credit at the expiration of the Term, together
with interest accruing on each of the advances at a rate equal to NBD Bank, N.A.'s prime rate plus
two (2%) percent. No interest shall accrue on the Principal Balance of this note until the Due
Date.  To evidence Physician's obligation to repay the advances made pursuant to, and to pay the
interest accruing on such advances, the Equipment Line of Credit Physician agrees to execute
concurrently with his execution of this Agreement the Equipment Line of Credit Note attached
hereto as Exhibit B.  May be paid by acceptable credit card.

**10.1 Security Agreement.**  In order to secure Physician's obligations pursuant to Section 10 hereof and those obligations contained in the Equipment Line of Credit Note Physician hereby grants to Hospital a security interest to the fullest extent permitted by law in all the property purchased with the proceeds of the Equipment Line of Credit and all replacements, attachments, and accessories thereto and all proceeds therefrom.  Physician acknowledges and agrees that this Section 10.1 shall be considered a security agreement for all purposes under Michigan law.  Physician further agrees to execute a UCC-1 Financing Statement to be filed with the Michigan Secretary of State and St. Clair County Register of Deeds.

11.  **Assignment and Binding Effect.**  This Agreement and all rights and benefits hereunder are personal to each party, and neither this Agreement nor any rights or interest of either party herein or arising hereunder may be transferred or assigned without the prior written consent of the other party.  This Agreement shall be binding upon and inure to the benefit of Hospital, its successors and assigns, and shall be binding upon the Physician, its successors, assigns and legal representatives.

12.  **Amendments.**  This Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes all prior agreements and understandings between the parties.  No amendments or variations of the term and conditions of this Agreement shall be valid unless the same is in writing and signed by both of the parties hereto.  No waiver of the rights of any party under this Agreement shall be construed to imply a waiver of any rights unless the waiver is in writing and signed by both parties.

13.  **Governing Law.**  The validity and interpretation of the Agreement shall be governed by the laws of the State of Michigan.

14.  **Renegotiation.**  In the event that there shall be a change in the Medicare or Medicaid Act, regulations or general instruction (or application thereof), the adoption of new legislation, or a change in any other third party payor reimbursement system, any of which materially affects the reimbursement which Hospital or the Physician may receive for their respective services furnished to patients hereunder, the parties may renegotiate any and all sections of this Agreement upon notice given and received.  Unless renegotiation is satisfactory to both parties within sixty (60) days thereafter, either party may terminate this Agreement with ninety (90) days notice to the other party on any future date specified in such notice with no further obligation to the other party.

15.  **Survival.**  The provisions of Sections 3, 4, 5.5, 5.8, 5.9, 8, 10 and 11, shall survive the termination or expiration of the Term.

16.  **Notices.**  All notices, requests or demands provided for by this Agreement shall be made in writing by depositing the notice, request or demand in the United States mail, postage prepaid, return receipt requested and addressed as follows:

If to Physician:    Peter G. Grain, M.D.

_____

_____

_____

With a copy to:

_____

_____

_____

_____

If to Hospital:    Mercy Health Services
d/b/a Mercy Hospital-Port Huron
2601 Electric Avenue
Port Huron, Michigan  48060
Tel:  (810) 985-1515
Fax:  (810) 985-1579
Attn:   Thomas Goldenbogen,
       Vice President, Network Development

With a copy to:    Daniel J. Schulte, Esq.
Kerr, Russell and Weber, P.L.C.
500 Woodward Avenue, Suite 2500
Detroit, Michigan  48226
Tel:  (313) 961-0200
Fax:  (313) 961-0388

Said notice, request or demand shall be deemed to be received, in the case of mailing, five (5) business days after mailing.  A business day is any Monday through Friday on which first class mail is delivered.  Personal delivery shall be an acceptable substitute for the making of any such notice, demand or request provided that a receipt for such delivery is obtained.

1741EE2.167 - 6/12/97

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first above written.

WITNESSES:

MERCY HEALTH SERVICES,
a Michigan nonprofit corporation d/b/a
MERCY HOSPITAL-PORT HURON

By: _Mary R. Trimmer_
        Mary R. Trimmer
Its: _President and Chief Executive Officer_

_Peter G. Grain, M.D._
Peter G. Grain, M.D.

# EXHIBIT A

## Equipment

Including, but not limited to:

- Cavatron Ultrasonic Asperator

- CRW Stereotactic Frame

- Zeiss Microscope - Nuria with Contraves Guidance

- Midas Rex Drill

1741EE2.167 - 6/12/97

## EXHIBIT B

## EQUIPMENT LINE OF CREDIT NOTE

$50,000 (Maximum Amount)                                   *June 27*, 1997

     **FOR VALUE RECEIVED**, the undersigned, **Peter G. Grain, M.D.** ("Debtor"), a Michigan resident, hereby promises to pay to the order of **Mercy Health Services**, a Michigan nonprofit corporation d/b/a **Mercy Hospital-Port Huron** ("Creditor"), the principal sum of Fifty Thousand ($50,000) Dollars, or such lesser amount that is actually advanced by Creditor to Debtor pursuant to the Equipment Line of Credit (the "Advances") as defined in a certain Income Guarantee Agreement entered into by and between Debtor and Creditor concurrently herewith (the "Income Guarantee Agreement"), together with interest thereon at a rate of NBD Bank, N.A.'s prime rate plus two (2%) percent per annum (the "Note Rate") while not in default. No interest shall accrue on the principal Balance of this Note until the Due Date. The entire principal sum and any accrued interest shall be payable on the Due Date, as defined in the Income Guarantee Agreement.

     The principal amount of any of the Advances may be repaid from time to time by Debtor and new Advances may be made by Creditor, at its sole discretion, from time to time. Interest shall accrue on each Advance as of the date each such Advance is made by Creditor. In no event shall the total outstanding principal amount of all Advances made pursuant to the Equipment Line of Credit exceed Fifty Thousand ($50,000) Dollars.

     All payments on this Note shall be applied first to accrued interest on the unpaid principal balance of this Note and any excess shall be applied against the principal balance.  This Note is secured by a Security Agreement executed concurrently on this day, granting to Creditor a security interest to the fullest extent permitted by law, in certain of Debtor's property, equipment, intangible assets, accounts, inventory, fixtures, proceeds and all other collateral of whatever form, as more fully set forth in said Security Agreement.  Notwithstanding any term or condition contained herein to the contrary, in the event of a default or a breach in any of the terms, conditions or covenants of the Security Agreement or the Income Guarantee Agreement, the entire principal amount of this Note, and all accrued interest shall, at the sole option of the Creditor, become immediately due and payable without notice or demand, and the outstanding principal balance shall bear interest at a rate equal to two (2%) percent in excess of the Note Rate.

     Debtor further agrees to pay all costs, expenses and attorneys' fees paid or incurred by Creditor or any holder hereof, in collecting any and all amounts due under this Note.  Debtor, and each and every person and party at any time liable for the payment of the debt evidenced hereby,

hereby waives presentment, demand, notice, protests and all other demands and notices in connection with the delivery, performance, default or enforcement of this Note.

No delay or omission on the part of Creditor or any holder hereof in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. A waiver of a breach in any provision of this Note shall not operate or be construed as a waiver of any subsequent breach. Each and every right, remedy and power granted herein or allowed by law shall be cumulative and not exclusive of any other.

The provisions of this Note shall be binding upon and enure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns. The parties agree for themselves, their heirs, personal representatives, successors and assigns to do all acts necessary to carry out the intents and purposes of the terms of this Note.

This Note shall be governed by and construed in accordance with the laws of the State of Michigan, notwithstanding the fact that either party is or may hereafter become domiciled outside the State of Michigan.

Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Note or affecting the validity or enforcement of such provision in any other jurisdiction.

This Note may be altered or amended in any of its provisions or terminated only by the mutual written agreement of the parties hereto.

"DEBTOR"

Peter G. Grain, M.D.



**MERCY** HOSPITAL
PORT HURON

2601 Electric Avenue • Port Huron, Michigan 48060-6518 • 810-985-1500

July 16, 1998

Peter G. Grain, M.D.
2603 Electric Ave., Suite 4
Port Huron, Michigan 48060

Re:    Income Guarantee Agreement

Dear Dr. Grain:

As you know, Mercy Health Services d/b/a Mercy Hospital-Port Huron executed an income guarantee agreement with you on or about June 27, 1998. In exchange for a substantial income guarantee, you agreed to fulfill the purposes of the agreement and certain obligations to Mercy Hospital-Port Huron. The purposes of the contract and your obligations are specified in the agreement, and include, but are not limited to:

1)    Providing neurosurgery coverage in the Emergency Room of Mercy Hospital-Port Huron (Section A. p.1).

2)    Relocating to the Port Huron area and diligently undertaking to establish a practice (Section 5.1, p.4).

3)    Exercising the utmost good faith and loyalty regarding the hospital (Section 5.9, p.6).

4)    Maintaining a good working relationship with the hospital's Medical Staff and Administration (Section 5.9.1, p.6).

5)    Participating and promoting the hospital's charitable purpose and community welfare to the best of your ability (Section 5.9.2).

Prior to the execution of the agreement, you had conversations with the Mercy staff concerning the requirements for you to "diligently establish a practice" and fulfill your obligations under the agreement. For example, it was understood by both parties to the agreement that you would diligently undertake to interact with and take other necessary action to establish relationships with physicians in the Port Huron area, including but not limited to neurologists, oncologists, and orthopaedic physicians so that you could establish your practice. Further, it was understood that you would diligently undertake to interact with and take other necessary action to establish relationships with physicians in the "thumb" area of the state, and establish and maintain clinics in this region. Further, you were to act to obtain privileges at other hospitals in that region.

Despite many efforts by the administration at Mercy Hospital to assist you to succeed in accomplishing the mutual objectives and purposes of the agreement, you have neither cooperated nor taken sufficient actions on your own initiative to fulfill your obligations under the agreement. Mercy Hospital has attempted to work with you since November 1, 1997, but you have continued to fail to meet your contractual obligations and have breached the agreement, including but not limited to the following particulars:

    a)     You have been unavailable to perform neurosurgery and/or neurosurgery consults due to your frequent absences from the community.

    b)     When you have been available, you have failed on numerous occasions to make sufficient proctoring arrangements enabling you to perform surgery.

    c)     You have failed to establish the relationships with physicians which are necessary to build a quality neurosurgery practice. Moreover, you have failed to even take reasonable actions to establish such relationships. You have failed to cooperate with reasonable actions of the administration that would assist you to establish such relationships.

    d)     You have failed to maintain a neurosurgery clinic at Deckerville Hospital, which would serve the "thumb" population.

    e)     You have failed to market your services independently so as to permit and facilitate the establishment of your practice. Moreover, you have failed to even take reasonable actions to market your services and have failed to cooperate with reasonable actions of the administration that would assist you to market these services.

As a result of your failure to meet your contractual obligations and your lack of initiative to fulfill the purposes of the agreement, you have substantially damaged Mercy Hospital's ability to maintain a quality neurosurgery service in the communities served by the hospital. Despite these numerous failures under the agreement, Mercy Hospital has honored the payment terms of the agreement so as to grant you sufficient time to act to satisfy your obligations.

Mercy Hospital entered into the agreement in good faith to ensure the provision of neurosurgery coverage in the community on terms mutually agreeable to you and the hospital. Mercy Hospital has also acted in good faith toward you during the term of the agreement, and has indeed been exceedingly patient with you, to give you the widest latitude and opportunity to meet your contractual obligations. Despite these good faith actions of the hospital, you have failed to perform your agreed obligations and have materially breached the agreement.

As a result, and without waiving any rights under the agreement or applicable law, Mercy Hospital-Port Huron requires that you do the following within twenty (20) days of the date of this letter. You must forward a detailed, written plan, signed by you, to the hospital which will be designed to remedy the failures specified in this letter. Your plan must include, but not be limited to, the following: appropriate specifics concerning your availability to perform consults, coverage, and surgery at the hospital; a letter drafted by you to all primary physicians in the Port Huron area to begin marketing neurosurgery services that will assist you in establishing your practice; a detailed timetable specifying the groups and individual physicians that you will meet with to market your services so as to establish your practice; a "bullet points" summary of the marketing points that you will make to these various physicians and physician groups; a letter drafted by you to physicians (including the list of physicians) to appropriate physicians in the "thumb" region to begin marketing neurosurgery services in this region so as to establish your practice; a detailed timetable specifying the groups and individual physicians that you will meet with to market your services in this region; a specific schedule for establishing and attending clinics that would serve the thumb population; a timetable concerning your application for privileges at other hospitals.

The above plan must be specific and agreeable to Mercy Hospital. Moreover, upon Mercy Hospital's approval of the written plan, you must immediately begin its implementation and act to fully and diligently adhere to and complete the plan.

Nothing in this letter is intended or shall be construed as a waiver of any rights possessed by Mercy Hospital-Port Huron under the agreement or applicable law, and all such rights are hereby expressly reserved.

Sincerely,

Thomas A. Goldenbogen
Vice President of Physician
Network Developing

**PETER G. GRAIN, M.D.**

*Adult and Pediatric Neurological Surgery*
2603 Electric Avenue • Suite 4
Port Huron, MI 48060
Telephone: (810) 987-1056

August 3, 1998

Tom Goldenbogen, V.P. Network Development
Mercy Hospital

Dear Tom:

I am responding to your letter dated July 16, 1998 outlining
deficiencies the Administration has identified in the
Neurosurgical service I have established here in Port Huron.
I will first address the "Failures" specified in your letter.

In the past I have been allotted six weeks of time away from
the hospital and one week-end per month, by contract, with
the two hospitals that I have had contacts with in the past.
Although not specifically addressed in my contract with
Mercy, I assumed the same allocations. Having practiced here
nine months so far, I have taken four weeks vacation and
seven weekends. When I am not out of town I am available 24
hours a day.

In regards to proctoring, my proctoring requirements have
been met. I had no control over the availability of the
Neurosurgeons Mercy insisted on using as proctors. In fact,
Dr. Rosenblum has never been available, having designated
Dr. Jack Rock to take his place. As you know intracranial
neurosurgical cases are not usually ones that can be planned
weeks in advance. The proctors I used, as well as any
neurosurgical proctor, would reasonably need two to three
weeks advance notice to be available. The proctoring
requirements for intracranial cases is three cases observed,
which I accomplished. The Medical Staff office was aware for
months that a letter was required from my proctors releasing
me from proctoring, yet less than 36 hours before a major
intracranial case was planned, I was told that the letter was
missing. I was still able to reschedule and do that case
despite this. Academic neurosurgeons characteristically are
not available. I do not feel that there was any failure on
my part to complete the proctoring process.

As regards establishing relationships with referring
physicians, I will write a letter of introduction, and visit
them all in their offices. As newcomers to the area very few
personal friendships have been extended to Annette and me. I
understand that these relationships develop with time, and it
should not be considered my sole responsibility. I am
finding that the referrals that I am receiving in my office
are not reflective of the payor mix in this area. I also see
a large number of high risk patients, with chronic problems
often present for ten or more years. I also see a large

Page 2

than once.  These are not the kinds of patients that will create a financially viable, quality neurosurgical service. This was apparent at the outset of my practice.  I am happy to see any patient, but feel pressure to meet the income guarantee.

I attempted to establish a clinic at Deckerville Hospital. We were set to start in March.  That start date was delayed because of lack of patients.  When I did ultimately have my first clinic eight patients were scheduled.  Five of them were Neurology and ENT patients.  Of the three I saw, one patient's problem had completely resolved (the patient had no complaints whatsoever).  The other two were not surgical candidates.  I had another clinic about six weeks later where only one new patient was scheduled.  I do not believe a clinic at Deckerville Hospital is a viable option to serve the Thumb, and I am not interested in going there.  There are two other hospitals in the Sandusky area that I contacted. McKenzie Hospital I visited and offered to do a CME, which they have not taken me up on.  Harbor Beach Hospital has no interest in a relationship with Mercy Hospital.  I do not view the progress in establishing clinics in these outlying areas as a failure on my part.

As regards independent marketing, I have suggested and am willing to give talks to the Service Organizations (J.C.'s, Lions Club, Knights of Columbus etc.), visit the Highschools, Middle and Elementary schools to give a career day or talk about Neurosurgery.  I would like to go on the radio again and if possible T.V. (although Port Huron Hospital controls the Health Network in this area), and give CME's to the Medical Staff.

My marketing plan will include:

   1)    Writing to and visiting the primary care physicians, neurologists and orthopedic surgeons.

   2)    Interacting with the community through Service Clubs, school system, radio and T.V.

   3)    Begin doing regular CME's at the Friday noon conference.

   4)    Joining the various Health Plans that I am not a member of at this time.

Page 3

The marketing points that I will make to the physicians that I visit will be:

1)      I offer quality, compassionate care.

2)      I have successfully performed stereotactic and aneurysm surgery at Mercy Hospital.

3)      I am an experienced (ten years in practice), conservative surgeon.

4)      Mercy Hospital has a fully equipped Neurosurgical O.R. with State-Of-The-Art equipment.

5)      The nursing staff has been excellent in Neuro-assessment.

6)      When in town I am available 24 hours a day, seven days a week.

I have received a list of physicians from Sue Penoza, and I will need her and the Administration's assistance in identifying the physicians I should visit.

I feel that most of the problems with this practice is that Port Huron Hospital's power has been underestimated. Their Industrial Health System and the orthopedic group at Port Huron Hospital are directing many true surgical cases to the St. John's neurosurgeons. There have been many intracranial cases seen in their E.R. that were sent directly to St. John's. Getting on staff at Port Huron Hospital should help this practice exceed expectations.

I am a conservative surgeon. I only do cases that I feel would truly benefit the patient. In this era of Managed Care and encroachment by other specialties on Neurosurgery, I am finding that borderline cases are being done just to do a case. I have seen several examples among patients sent by me to other institutions for second opinions, as well as cases sent elsewhere by others when I suggested no surgery. The results were horrible or the patient is expected to not do well. I would be happy to elaborate and have been commended by physicians here for sticking to my guns regarding not offering surgery. In other words the data presented to me when I was recruited regarding the number of cases available does not reflect what would be a case for Dr. Peter Grain. I am prepared to begin the marketing plan that I have outlined

Page 4

Finally  I  do not feel that I have failed to live up  to  my
contractual  agreement  with Mercy.   I will make an  intense
effort  to market this practice and assure you that I want to
be  successful here in Port Huron.   However, a multitude  of
factors  have played in the progress of Neurosurgery at Mercy
and  any  success  or "failure" must be  shared  between  the
hospital and myself.

                              Sincerely



PG/jk                         Peter G. Grain, M.D



**MERCY HOSPITAL**
PORT HURON

2601 Electric Avenue • Port Huron, Michigan 48060-6518 • 810-985-1500

PERSONAL & CONFIDENTIAL

To:       Peter Grain, M.D.

From:     Thomas Coury, M.D., Chief
          Department of Surgery

Subj:     Incident Reports

Date:     January 26, 1999

The Peer Review File was developed to protect the confidentiality of the peer review data and prevent unauthorized disclosure of information.

This notice is being sent to you in accordance with the Policy and Procedure on Medical Staff Peer Review File.   Eight patient/incident reports involving your patients from the time period of June, 1998 through November, 1998 were forwarded to my attention on January 8, 1999.  Copies of those eight reports were subsequently forwarded to you on January 22, 1999 for review and subsequent discussion with myself.

On January 25, 1999, we discussed the eight incident reports and subsequently I have determined that these incident reports, which were forwarded to my attention in an untimely manner, do not warrant placement in your Peer Review File, nor any further action by you or myself as Chief of Surgery.  Therefore, a copy of this notice only, documenting that the incident reports have been reviewed and discussed by us, is placed in your Peer Review File with no further action required.  The incident reports as forwarded to me have been placed in the confidential waste container for appropriate disposal.

TAC/cms

cc: B. Ramesh Reddy, M.D.
    Chief of Staff

Affiliated with Mercy Community Healthcare

## TERMINATION AND MUTUAL RELEASE AGREEMENT

**THIS TERMINATION AND MUTUAL RELEASE AGREEMENT** is made this 2ed day of February, 1999, by and between **Mercy Health Services d/b/a Mercy Hospital, Port Huron**, a Michigan nonprofit corporation (the "Hospital") and **Peter G. Grain, M.D.**, a Michigan resident (the "Physician").

**RECITALS:**

**A.** The Hospital and the Physician entered into an Income Guarantee Agreement dated June 27, 1997 (the "Income Guarantee Agreement").

**B.** The Physician executed and delivered to the Hospital an Equipment Line of Credit Note dated June 27, 1997 (the "Promissory Note").

**C.** Subject to the terms and conditions of this Termination and Mutual Release Agreement the Hospital and the Physician now each desire to (1) terminate the Income Guarantee Agreement and the Promissory Note, (2) release each other from any and all past, present and future obligations, liabilities, claims, etc. pursuant to the Income Guarantee Agreement, the Promissory Note or otherwise.

**NOW, THEREFORE,** in consideration of the above recitals, the mutual covenants and promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged and agreed to, the Hospital and the Physician agree as follows:

**1.** **Termination.** Notwithstanding Section 6 or any other term or condition contained in the Income Guarantee Agreement to the contrary, the Hospital and the Physician each agree to terminate both the Income Guarantee Agreement and the Promissory Note. The termination of the Income Guarantee Agreement and the Promissory Note shall be effective on the date of this Agreement.

**2.** **Mutual Release.** The Hospital and the Physician hereby mutually release and discharge each other from any and all liabilities, obligations, claims, demands, causes of action, suits, damages, costs, expenses and compensation of every kind and nature whatsoever, known or unknown, direct or indirect, which either the Hospital or the Physician now has, may have had, may at any time hereafter have asserted and/or could have asserted against each other on account of or in consequence of all transactions and dealings by, between or among them including, without limitation, any and all claims, liabilities and obligations arising out of or relating in any way to the Income Guarantee Agreement or the Promissory Note.

3.    **Modification of Sublease.**  The Hospital and the Physician agree that the Sublease, currently on a month-to-month basis, shall hereby be modified and transferred to Annette Barnes include a term which shall expire no  earlier than one year or February 1 1999.

4.    **Miscellaneous.**

    a.    **Amendment of Agreement.**  This Agreement may be altered or amended in any of its provisions only by the mutual written agreement of the Hospital and the Physician.

    b.    **Governing Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan, notwithstanding the fact that the Hospital or the Physician is or may hereafter become domiciled in a different state.

    c.    **Assignment.**  This Agreement may not be assigned by any party hereto without the prior written consent of all parties hereto.

    d.    **Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the Hospital and the Physician and their respective heirs, personal representatives and successors.  The Hospital and the Physician agree for themselves, their heirs, personal representatives and successors to do all acts necessary to carry out the intents and purposes of this Agreement.

    e.    **Entire Agreement.**  This Agreement constitutes the entire agreement between the Hospital and the Physician with respect to the subject matter hereof and supersedes any and all other previous or contemporaneous communications, representations, understandings, agreements, negotiations and discussions, either oral or written, between or among the Hospital and the Physician.  The Hospital and the Physician acknowledge and agree that there are no written or oral agreements, understandings or representations, directly or indirectly related to this Agreement or any subject matter hereof, that are not set forth herein.

IN WITNESS WHEREOF, the undersigned have executed this Agreement effective as of the day and year first set forth above.

IN THE PRESENCE OF:                    HOSPITAL:

                                       Mercy Health Services
                                       d/b/a Mercy Hospital, Port Huron,
                                       a Michigan nonprofit corporation

_____              By:_____

                                       Its:_____


                                       PHYSICIAN:

_____

                                       Peter G. Grain, M.D.

06/25/03   WED 11:10 FAX 8109871060          PETER G GRAIN

## INCOME GUARANTEE AGREEMENT

THIS INCOME GUARANTEE is made this ○7 day of *June*, 1997 by and between **Mercy Health Services**, a Michigan nonprofit corporation d/b/a Mercy Hospital Port Huron (the "Hospital"), and **Annette Barnes M.D.**, a Michigan resident (the "Physician").

## RECITALS:

**A.**     Hospital has identified a need for quality pediatric primary care services in the Hospital's service area as part of its integrated health care delivery system.  Hospital has determined that in furtherance of its community obligation and charitable purposes it should recruit a pediatrician to its service area in order to provide local community coverage of this needed specialty.

**B.**     Hospital, in order to so recruit and attract such a pediatrician, has explored several alternatives regarding the recruitment and retention of a pediatrician  and has determined that the only feasible method to accomplish these goals is through the use of recruitment incentives including, but not limited to, providing financial assistance with the cost associated with the establishment of a pediatric practice (the "Practice") in the St. Clair County Community.

**C.**     Hospital has considered the alternatives and, after thorough evaluation by a special committee of its Board of Directors, has determined and concluded that the incentives and assistance provided for in this Agreement are reasonable and appropriate given the initial cost associated with starting up a pediatric practice in the Hospital's service area.

**D.**     The Physician is willing to make a long term commitment to provide medical services in the Hospital's service area which will help alleviate the existing and projected shortage of pediatric primary care services in the Hospital's service area.

NOW, **THEREFORE**, in consideration of the above recitals, the mutual covenants and promises contained herein, and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged and agreed to, Physician and  Hospital agree as follows:

1.     **Definitions.**  The terms set forth below shall, for purposes of this Agreement, have the meanings set forth in this Section 1 when such terms appear capitalized.  Other capitalized terms used in this Agreement shall have the meanings set forth in the applicable sections of this Agreement.

    1.1     **Net Practice Income.**  Net Practice Income shall equal the revenues generated by the Practice less the reasonable and customary Professional Expenses necessary to conduct the Practice during the term of this Agreement.  The amount of the revenues of the Practice and the Professional Expenses shall be determined on a full accrual basis in accordance with generally accepted accounting principals

IGBARNES WPD - 6/25/97

Notwithstanding the foregoing, the Practice's expense for bad debts and contractu allowances shall be adjusted on the Due Date to accurately reflect the uncollected revenu of the Practice during the Term.

       **1.2**   **Professional Expenses.** Professional Expenses includes fixed and variab expenses which are directly allocable and normally and reasonably associated with the operation of the Practice and which are typically deemed to be deductible busines expenses pursuant to the provisions of the Internal Revenue Service Code of 1986 amended (the "Code"). Notwithstanding any term or condition contained herein to the contrary, Professional Expenses shall not include (i) the cost of capital items which und generally accepted accounting principles would be capitalized rather than expensed, (ii) the salaries, fringe benefit expenses or other compensation or benefit payments made by the Practice to the Physician or any other physician employees of the Practice, and (iii) an rent, service or other fees, costs or expenses paid or incurred by the Practice to any pers or entity related to the Physician or the Practice in a manner described in Section 267 the Code.

       **2.**   **Income Guarantee.** Hospital agrees, upon the terms and conditions contain herein, to provide the Physician a signing bonus of $15,000 and a three year income guarantee $130,000 the First Year, $ 150,000 Year Two, and$ 150,000 Year Three (the "Income Guarant Amount"). The Income Guarantee Amount shall be advanced by the Hospital to the Physician a monthly basis (the "Income Guarantee Advances"). The amount of each Income Guarant Advance shall be equal to the sum of (i) Ten Thousand Eight Hundred Thirty-Three 'Doll ($10,833) for the First Year and Twelve Thousand Five Hundred Dollars ($12,500)for Years Tw and Three  (ii) plus an estimate of  the expenses of the Practice for one month to be mutuall agreed upon by the Hospital and Physician (iii) less the  cash collections of the Practice's revenu during the preceding month. One month's  of Year One Income Guarantee will be given upon the first day of practice by the Hospital and shall  continue thereafter on the first day of the secon month and each month of the Term until the total of the Income Guarantee Advances equals  th Income Guarantee Amount.  Notwithstanding any term or condition contained herein to th contrary, the Hospital shall not be obligated to make any Income Guarantee Advance to th Physician (i) if the amount of such Income Guarantee Advance combined with the total of a previous Income Guarantee Advances would exceed the Income Guarantee Amount or (i subsequent to the termination of this Agreement.

       **3.**   **Payment and Repayment of Income Guarantee Amount.** On the date the Term expires, Hospital shall calculate the Net Practice Income, subject to adjustment on the Due Dat for bad debt expense and contractual allowances as provided in Section 1.1 of this Agreement of the Practice for the Term. The Hospital's obligation to make a further payment to Physicia of a portion of the Income Guarantee Amount and Physician's obligation to repay the amount o the Income Guarantee Advances shall be determined as follows:

       **3.1**   **Net Practice Income Less Than Income Guarantee Amount.** In the even Net Practice Income for the Term is less than the Income Guarantee Amount (the "Deficiency"), Hospital will make a final cash payment to Physician in an amount equa

to: (i) the Deficiency, minus (ii) the amount of the Income Guarantee Advances previous
made by Hospital to Physician pursuant to Section 2 of this Agreement.  If the deficien
is less than the amount of the previous Income Guarantee Advances, the Hospital shall
make any further payment to Physician.  Physician agrees to repay to Hospital the total
the amount paid by the Hospital pursuant to this Section 3.1 plus the amount of all previc
Income Guarantee Advances, together with interest accruing at a rate of two (2%) perce
over NBD Bank, N.A.'s (Port Huron) prime lending rate, in thirty-six (36) equal month
installments (the "Installments") beginning on the first day of the thirteenth (13th) mor
following the month in which the Term expires. No interest shall accrue until the first d
of such 13th month.  Physician agrees to execute a Promissory Note, satisfactory in fo
and content to Hospital's legal counsel, on the date the Term expires to evidence
obligation to pay the Installments.  Should Physician fail or refuse to execute and deliv
this Promissory Note then this Agreement shall serve as sufficient evidence of
obligation to pay the Installments.  Notwithstanding any term or condition contained her
to the contrary, Hospital agrees to forgive and discharge, on a monthly basis, ea
Installment so long as Physician continues to practice full-time medicine in the Hospita
service area and remains a member in good standing of the Hospital's medical sta
Hospital agrees the Physician can pay with a credit card acceptable to Hospital.

   3.2    **Net Practice Income Exceeds the Income Guarantee Amount.**  If the N
Practice Income of the Practice for the Term exceeds the Income Guarantee Amoun
Physician agrees to repay to the Hospital an amount equal to the total of all previc
Income Guarantee Advances (the "Repayment Amount").  The Repayment Amount w
be due on the date (the "Due Date") one year from the expiration of the Term.  Physicia
agrees that if he fails to pay the Repayment Amount on the Due Date it shall begin, as
the Due Date, to accrue interest at a rate equal to NBD Bank, N.A.'s (Port Huron) pri
lending rate plus two (2%) percent.  Physician agrees to execute and deliver to
Hospital, on the date the Term expires, a Promissory  Note, in form and conte
satisfactory to Hospital's legal counsel, to evidence his obligation to pay to the Hospi
the Repayment Amount.  If Physician fails or refuses to execute or deliver this Promiss
Note then this Agreement shall serve as evidence of his obligation to pay to the Hospi
the Repayment Amount.  Hospital agrees the Physician can pay with a credit ca
acceptable to Hospital.

   3.3    **Income Guarantee Advances Due in Full Immediately.**  Notwithstandin
any term or condition contained herein to the contrary, Physician agrees that the amou
of all Income Guarantee Advances shall become immediately due and payable to Hospita
without any notice or demand by Hospital, upon the happening of any of the followin
events: (a) Hospital terminates this Agreement for cause pursuant to Section 6.2 of t
Agreement, (b) Physician unilaterally terminates this Agreement prior to the expiration
the Term, or (c) Physician breaches any term or condition contained in this Agreeme

4.   **Dispute Resolution.**   Any disputes involving the interpretation, breach enforcement of this Agreement which cannot be resolved by Hospital and Physician shall resolved by binding arbitration in accordance with the rules of the American Arbitra Association. The prevailing party shall be awarded his/its costs, including actual attorney f The arbitration panel or sole arbitrator, as may be applicable, shall consist of at least one certi public accountant. Decisions of the arbitration panel will be binding on both Hospital and Physician.

5.   **Covenants of Physician.**   Notwithstanding any term or condition contained he to the contrary, the Hospital's obligation to make any Income Guarantee Advance to the Physi is subject to the Physician's continuing fufillment of the following covenants:

5.1   **Establishment of Practice.**   Physician shall relocate to the Port Huron and shall diligently undertake to establish the Practice in a location which is within a (1) mile radius of the Hospital. Notwithstanding any term or condition contained her to the contrary, Physician agrees to establish the Practice as required herein by ~~Septem~~ 31, 1997.

5.2   **Licensure and Certification.**   Physician shall be duly licensed to prac medicine in the State of Michigan and shall maintain such licensure at all times during term of this Agreement.

5.3   **Medical Staff Membership.**   Physician shall become and, at all ti during the term of this Agreement, remain a member in good standing of the Medical S of Hospital in a category other than temporary or consulting with all the privileges subject to all the Medical Staff Bylaws and Rules and Regulations.

5.4   **Independent Contractor Status.**   It is expressly acknowledged understood by the parties that nothing in this Agreement is intended nor shall be constr to create any employer/employee relationship, joint venture relationship, or to all Hospital the right to exercise any control or direction over the manner or method by wh Physician performs the services in connection with the Practice under this Agreeme Physician understands and agrees that Hospital will not withhold on behalf of Physic any sums for income tax, unemployment insurance, Social Security or other withhold pursuant to any law, requirement or any other governmental body relating to Physic. or make available to Physician any benefits afforded to employees of Hospital. All sm payments, withholdings and benefits, if any, are the sole responsibility of Physician a Physician will indemnify and hold Hospital harmless from and against any and all clai that Hospital is or was responsible for the payment or filing of any of the forego payments, withholdings, contributions, taxes and relevant documents and returns.

5.5   **Insurance.**   Physician agrees to obtain and maintain professional liabili insurance which will cover all claims related to or arising from services provided Physician in a minimum amount of One Million ($1,000,000) Dollars per claim and Th Million ($3,000,000) Dollars in the aggregate. Physician shall, from time to time up

the request of Hospital, provide written proof of such professional liability insurance to Hospital for Physician during the term of this Agreement.

**5.6    Reimbursement Participation.**    Physician shall be a participant for reimbursement purposes in Blue Cross/Blue Shield of Michigan, Medicare, Medicaid, and such other third party payors and managed health plans, e.g. CareChoices, Health Alliance Plan, SelectCare etc., excepting those plans which have commercial rates no lower than 110% of Medicare RBRVS, as the parties shall mutually agree upon as deemed necessary to benefit the community.

**5.7    Access to Records.**    To the extent that Section 952 of the Omnibus Reconciliation Act of 1980 (the "Act") and the regulations promulgated thereunder are applicable to this Agreement, Physician, when receiving from Hospital $10,000 or more in any twelve month period, shall, until four years after the expiration of the services provided hereunder, comply with the requests made by the Comptroller General, the Secretary of the Department of Health and Human Services, and their duly authorized representatives for access, in accordance with Section 952 of the Act, to any contract or agreement between Physician and Hospital for services and to any contract or agreement between Physician and any related organizations or physicians, as well as the books, documents, and records of Physician and such related organizations or physicians which are necessary to verify the costs of the services provided, when such were received from Hospital.    Physician shall indemnify and hold harmless Hospital if any amount of reimbursement is denied or disallowed because of the failure of Physician to comply with the obligations of this Section.    Such indemnity shall include, but not be limited to, the amount of reimbursement denied or disallowed, plus any interest, penalties and legal costs.

**5.8    Audit of Physician's Books and Records.**    Upon the request of and notice by Hospital, but not less than monthly, Physician agrees to permit the agents and employees of Hospital to review and take extracts from Physician's books and records during normal business hours at mutually convenient times pertaining to the Practice during the Term.

**5.9    Other Activities.**    Physician shall act with utmost good faith and loyalty with regard to Hospital, including, but not limited to, the following:

　　　　5.9.1   Maintain a good working relationship with the Hospital's Medical Staff and Administration to the best of their ability; and

　　　　5.9.2   Participate and promote the Hospital's charitable purpose and community welfare to the best of his ability, providing this responsibility does not materially interfere with the Practice.

**5.10    Lack of Restriction.**    The parties acknowledge that nothing contained in this Agreement, or implied, shall (1) make the benefits of this Agreement conditioned upon the referral of patients to Hospital; (2) prevent Physician from establishing staff privileges

at, providing services in, or making referrals to any other hospital; (3) prevent
admission of patient in any other facility for the convenience of the patient or as a re
of preference of patient; or (4) otherwise make conditional the benefits and provision
this Agreement.

6.   **Term and Termination.**

   6.1   **Term.** Unless terminated earlier pursuant to Section 6.2, the term of
Agreement (the "Term") shall be for a period commencing on _____, 1!
and ending on _____, ~~1998;~~ 2,000 *A3*

   6.2   **Termination.** This Agreement may be terminated by Hospital at any
for "cause." For purposes of this Agreement "cause" shall mean the following:

      6.2.1   Physician's failure to maintain his license to practice medicine

      6.2.2   Physician's failure to maintain staff privileges at Hospital;

      6.2.3   A breach by Physician of any covenants contained in this Agreer
which are not remedied to the satisfaction of Hospital within twenty (20)
following such breach;

      6.2.4   The cancellation of Physician's professional liability insura
coverage required to be maintained by Section 5.5 of this Agreement;

      6.2.5   Physician's conviction for violation of any criminal statute.

*(iii) and an insurance tail allowance not to exceed Eight Thousand ($8000)*

7.   **Bonuses.** In consideration of Physician entering into this Agreement,
performance of her covenants contained herein and relocating to, establishing and maintaining
Practice in the Hospital's Service Area as provided herein Hospital agrees to pay to Physician
on Physician's behalf, the following amounts (collectively referred to herein as the "Bonuse
(i) a signing bonus equal to Fifteen Thousand ($15,000) Dollars (ii) a relocation allowance
reimbursement of actual moving expenses incurred not to exceed Eight Thousand ($8,000) Do
Notwithstanding any term or condition contained herein to the contrary, Physician agrees
if the Practice is not maintained in the Hospital's service area from the date of this Agreement
_____, ~~2002~~ 2001 she will immediately repay to the Hospital a prorata portion, base
the number of months remaining between the date the Practice is terminated
_____, ~~2002,~~ 2001 of the total amount of the Bonuses.

8.   **Equipment Line of Credit.** During the Term, if no default or breach of
Agreement or any Promissory Note entered into in connection with this Agreement has occur
Hospital agrees to make available to Physician for purchases of medical equipment for use in
Practice a line of credit (the "Equipment Line of Credit"). The maximum amount of all adva
made by the Hospital pursuant to the Equipment Line of Credit shall not exceed Fifty Thous

($50,000) Dollars.  The Hospital shall only be obligated to advance funds pursuant to t
Equipment Line of Credit to Physician upon its receipt of a satisfactory description, includi
supporting documents, e.g. invoices, purchase orders, etc., of the medical equipment to
purchased for use in the Practice with such advance(s).  Physician agrees to repay the amount
all advances made pursuant to the Equipment Line of Credit at the expiration of the Term, toget!
with interest accruing on each of the advances at a rate equal to NBD Bank, N.A.'s prime rate p
two (2%) percent.  No interest shall accrue on the Principal Balance of this note until the D
Date.  To evidence Physician's obligation to repay the advances made pursuant to, and to pay
interest accruing on such advances, the Equipment Line of Credit Physician agrees to exec:
concurrently with his execution of this Agreement the Equipment Line of Credit Note attach
hereto as Exhibit A.  May be paid by acceptable credit card.

    **8.1 Security Agreement.**  In order to secure Physician's obligations pursuant to Secti:
10 hereof and those obligations contained in the Equipment Line of Credit Note Physici:
hereby grants to Hospital a security interest to the fullest extent permitted by law in all t
property purchased with the proceeds of the Equipment Line of Credit and .
replacements, attachments, and accessories thereto and all proceeds therefrom.  Physici:
acknowledges and agrees that this Section 10.1 shall be considered a security agreem«
for all purposes under Michigan law.  Physician further agrees to execute a UC(
Financing Statement to be filed with the Michigan Secretary of State and St. Clair Coun
Register of Deeds.

    **9.**    **Assignment and Binding Effect.**  This Agreement and all rights and benf
hereunder are personal to each party, and neither this Agreement nor any rights or interes:
either party herein or arising hereunder may be transferred or assigned without the prior wri:o
consent of the other party.  This Agreement shall be binding upon and inure to the benefit
Hospital, its successors and assigns, and shall be binding upon the Physician, its success :r
assigns and legal representatives.

    **10.**    **Amendments.**  This Agreement constitutes the entire agreement between the pa :ti
concerning the subject matter hereof and supersedes all prior agreements and understand n:
between the parties.  No amendments or variations of the term and conditions of this Agreeɪɛ
shall be valid unless the same is in writing and signed by both of the parties hereto.  No waiv
of the rights of any party under this Agreement shall be construed to imply a waiver of any rigʰ
unless the waiver is in writing and signed by both parties.

    **11.**    **Governing Law.**  The validity and interpretation of the Agreement shall
governed by the laws of the State of Michigan.

    **12.**    **Renegotiation.**  In the event that there shall be a change in the Medicare
Medicaid Act, regulations or general instruction (or application thereof), the adoption of ne
legislation, or a change in any other third party payor reimbursement system, any of whic
materially affects the reimbursement which Hospital or the Physician may receive for :he
respective services furnished to patients hereunder, the parties may renegotiate any and all sec ior
of this Agreement upon notice given and received.  Unless renegotiation is satisfactory to bo:
parties within sixty (60) days thereafter, either party may terminate this Agreement with n ne

(90) days notice to the other party on any future date specified in such notice with no furth
obligation to the other party.

    13.    **Survival.** The provisions of Sections 3, 4, 5.5, 5.8, 5.9, 7, 8 and 9, shall surv
the termination or expiration of the Term.

    14.    **Notices.** All notices, requests or demands provided for by this Agreement shall
made in writing by depositing the notice, request or demand in the United States mail, post
prepaid, return receipt requested and addressed as follows:

| | |
|---|---|
| If to Physician: | Annette Barnes, M.D. |

With a copy to:

| | |
|---|---|
| If to Hospital: | Mercy Health Services |
| | d/b/a Mercy Hospital-Port Huron |
| | 2601 Electric Avenue |
| | Port Huron, Michigan  48060 |
| | Tel:  (810) 985-1486 |
| | Fax:  (810) 985-1579 |
| | Attn:  Thomas Goldenbogen, |
| |       Vice President, Network Development |
| With a copy to: | Daniel J. Schulte, Esq. |
| | Kerr, Russell and Weber, P.L.C. |
| | 500 Woodward Avenue, Suite 2500 |
| | Detroit, Michigan  48226 |
| | Tel:  (313) 961-0200 |
| | Fax:  (313) 961-0388 |

Said notice, request or demand shall be deemed to be received, in the case of mailing, five
business days after mailing.  A business day is any Monday through Friday on which first c
mail is delivered.  Personal delivery shall be an acceptable substitute for the making of any s
notice, demand or request provided that a receipt for such delivery is obtained.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first above written.

WITNESSES:

MERCY HEALTH SERVICES,
a Michigan nonprofit corporation d/b/a
MERCY HOSPITAL-PORT HURON

By: _____
　　　 Mary Trimmer
Its: _President and Chief Executive Officer_

_____
Annette Barnes, M.D.

06/25/03  WED 11:16 FAX 8109871060          *PETER G GRAIN*

## EXHIBIT A

## EQUIPMENT LINE OF CREDIT NOTE

$50,000 (Maximum Amount)                                    *June 27,* 1997

    **FOR VALUE RECEIVED**, the undersigned, **Annette Barnes, M.D.** ("Debtor"), a Michigan resident, hereby promises to pay to the order of **Mercy Health Services**, a Michigan nonprofit corporation d/b/a **Mercy Hospital-Port Huron** ("Creditor"), the principal sum of Fifty Thousand ($50,000) Dollars, or such lesser amount that is actually advanced by Creditor to Debtor pursuant to the Equipment Line of Credit (the "Advances") as defined in a certain Income Guarantee Agreement entered into by and between Debtor and Creditor concurrently herewith (the "Income Guarantee Agreement"), together with interest thereon at a rate of NBD Bank, N.A.'s prime rate plus two (2%) percent per annum (the "Note Rate") while not in default. No interest shall accrue on the principal Balance of this Note until the Due Date. The entire principal sum and any accrued interest shall be payable on the Due Date, as defined in the Income Guarantee Agreement.

    The principal amount of any of the Advances may be repaid from time to time by Debtor and new Advances may be made by Creditor, at its sole discretion, from time to time. Interest shall accrue on each Advance as of the date each such Advance is made by Creditor. In no event shall the total outstanding principal amount of all Advances made pursuant to the Equipment Line of Credit exceed Fifty Thousand ($50,000) Dollars.

    All payments on this Note shall be applied first to accrued interest on the unpaid principal balance of this Note and any excess shall be applied against the principal balance. This Note is secured by a Security Agreement executed concurrently on this day, granting to Creditor a security interest to the fullest extent permitted by law, in certain of Debtor's property, equipment, intangible assets, accounts, inventory, fixtures, proceeds and all other collateral of whatever form, as more fully set forth in said Security Agreement. Notwithstanding any term or condition contained herein to the contrary, in the event of a default or a breach in any of the terms, conditions or covenants of the Security Agreement or the Income Guarantee Agreement, the entire principal amount of this Note, and all accrued interest shall, at the sole option of the Creditor, become immediately due and payable without notice or demand, and the outstanding principal balance shall bear interest at a rate equal to two (2%) percent in excess of the Note Rate.

    Debtor further agrees to pay all costs, expenses and attorneys' fees paid or incurred by Creditor or any holder hereof, in collecting any and all amounts due under this Note. Debtor, and each and every person and party at any time liable for the payment of the debt evidenced hereby, hereby waives presentment, demand, notice, protests and all other demands and notices in connection with the delivery, performance, default or enforcement of this Note.

No delay or omission on the part of Creditor or any holder hereof in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Note. A waiver of a breach in any provision of this Note shall not operate or be construed as a waiver of any subsequent breach. Each and every right, remedy and power granted herein or allowed by law shall be cumulative and not exclusive of any other.

The provisions of this Note shall be binding upon and enure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns. The parties agree for themselves, their heirs, personal representatives, successors and assigns to do all acts necessary to carry out the intents and purposes of the terms of this Note.

This Note shall be governed by and construed in accordance with the laws of the State of Michigan, notwithstanding the fact that either party is or may hereafter become domiciled outside the State of Michigan.

Any provision of this Note which is prohibited or unenforceable in any jurisdiction shall as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Note or affecting the validity or enforcement of such provision in any other jurisdiction.

This Note may be altered or amended in any of its provisions or terminated only by the mutual written agreement of the parties hereto.

"DEBTOR"

_____

Annette Barnes, M.D.