UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETER G. GRAIN, M.D. and ANNETTE
BARNES, M.D.,
      Plaintiffs,

v.

TRINITY HEALTH, MERCY HEALTH
SERVICES, INC., d/b/a MERCY
HOSPITAL-PORT HURON, MARY R.
TRIMMER, JERE BALDWIN, M.D.,
BERNARD VELARDO, M.D., and
MAHMOUD CHAFTE, M.D.,
      Defendants.
_____/

Case No. 03-72486

Honorable Patrick J. Duggan

## OPINION AND ORDER DENYING PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in the U.S.
District Courthouse, City of Detroit, County of
Wayne, State of Michigan, on August 13, 2008.

PRESENT: THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

Plaintiffs Peter Grain, M.D. ("Dr. Grain") and Annette Barnes, M.D. ("Dr. Barnes")(collectively "Plaintiffs") filed this lawsuit on June 26, 2003. Defendants are Trinity Health ("Trinity"), its subsidiary Mercy Health Services d/b/a Mercy Hospital - Port Huron ("Mercy" or the "hospital"), Mercy's President and Chief Executive Officer Mary R. Trimmer ("Trimmer").[1]

Plaintiffs filed a sixteen count Complaint against Defendants asserting various

---

[1] By stipulation of the parties, this Court issued an Order on January 27, 2004, dismissing without prejudice Drs. Baldwin and Velardo. On June 12, 2008, this Court dismissed Dr. Chafte as a defendant due to his death on May 5, 2004.

theories of liability. Presently before the Court are Dr. Grain's motions for summary judgment on his tortious interference with business relations (Count VI) and tortious interference with contractual relations (Count VII) claims, filed May 16, 2008 and June 8, 2008, respectively, Trinity, Mercy, and Trimmer's cross-motion for summary judgment on the intentional interference with business relations claim, filed June 9, 2008, and Trimmer's cross-motion for summary judgment on the intentional interference with contractual relations claim, filed July 2, 2008. The Court held a hearing on the summary judgment motions on August 7, 2008. For the reasons set out below, the Court grants Defendants' cross-motions for summary judgment.

**Standard for Summary Judgment**

Summary judgment is appropriate only when there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must

2

come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

**Factual Background**

Dr. Grain and his wife, Dr. Annette Barnes, filed suit against Defendants on June 26, 2003. On November 7, 2003, Defendants moved for partial summary judgment as to several of the Counts and to compel arbitration. This Court dismissed six of the counts in Plaintiffs' Complaint, holding that the parties were obligated to arbitrate Dr. Grain's claims for breach of the IGA (Count III), misrepresentation (Count V); civil extortion Count XIV) and rescission (Count XVI); and Dr. Barnes' claims for breach of her individual IGA (Count X) and misrepresentation (Count XVI). The Court dismissed Dr. Grain's claim for breach of an implied covenant of good faith and fair dealing (Count IV), and Dr. Grain's claim of economic duress (count XV) as time-barred under Michigan's three-year statute of limitations, MICH. COMP. LAWS 600.5805(10). The Court stayed the remaining claims pending arbitration. (Order, 8/11/04.)

After 45 days of arbitration, the arbitration panel ruled that the release Dr. Grain signed to terminate his Income Guarantee Agreement ("IGA") should be rescinded because he signed it under coercion and duress. The arbitration panel found that the actions Defendants took to secure the release were wrongful. (Arbitration Award, pp 8-9.) The arbitration panel also ruled that Mercy breached the IGA when it did not make its monthly payment to Dr. Grain in June 1998, pursuant to the IGA terms, and when Mercy sent Dr. Grain a termination letter in January 1999 that did not specify the cause of the termination. (Arbitration Award, p 9.) The arbitration panel entered judgment in favor of Defendants and against Dr. Grain and Dr. Barnes on the remaining claims arbitrated. (Arbitration Award, pp 9-12.)

The case has now returned to this Court, and the parties are seeking summary judgment on Dr. Grain's tortious interference with business and contract relations claims. Dr. Grain's tortious interference with business and contract relations claims arise out of his employment relationship with Mercy and the IGA that Dr. Grain entered into with Mercy on June 27, 1997, whereby Mercy guaranteed Dr. Grain a certain annual income for three years in exchange for Dr. Grain's neurosurgery and emergency room services. Dr. Grain signed a release terminating the IGA on February 2, 1999.

Dr. Grain alleges that Defendants' conduct in securing the release of the IGA and Defendants' interference with Dr. Grain's staff privileges adversely affected Dr. Grain's "referral basis." Specifically, Dr. Grain alleges that "[a]s of February 1999, Defendants had been plotting for nearly nine months to terminate Dr. Grain's IGA and to replace

4

him." During that period, Dr. Grain alleges that Defendants used influential members of the hospital's medical staff "to create faulty grounds to terminate the IGA and put his [Dr. Grain's] medical staff privileges in question." Dr. Grain points to the multiple peer reviews Defendants conducted of Dr. Grain's work, none of which revealed anything negative about his work, as evidence of Defendants' plot. (Pl's. Mot. Summ. J. Count VI, pp 10-12, 18-20.) Dr. Grain also alleges that in 2000, Mercy transferred all neurosurgery cases out of Mercy and refused to refer any patients to Dr. Grain. Dr. Grain argues that this inhibited him from building his practice. As a result, he claims that he tried to leave Mercy and began negotiations with a hospital in Springfield, Ohio in January 2001. But when the Ohio hospital contacted Mercy as part of the credentialing process, Dr. Baldwin, who headed Mercy's emergency room, gave "malicious, scathing and defamatory review" of Dr. Grain. As a result, the Ohio hospital broke off negotiations with Dr. Grain. According to Dr. Grain, Mercy began its final assault in 2002 by taking steps to end all neurosurgery at Mercy, and ultimately, closed the intracranial surgery program on April 10, 2003. Dr. Grain argues that Defendants successfully ruined his reputation and neurosurgery career. (Pl's. Resp. Defs.' Mot. Summ. J. Count VI, pp 1-2, 9-13.)

With respect to his tortious interference with contractual relations claim, Dr. Grain alleges that Trimmer and Dr. Chafte interfered in his contractual relations with Mercy by: 1) ignoring the hospital's findings that Dr. Grain was meeting the "community's needs; 2) ignoring evidence that Dr. Grain was not responsible for a patient's death; 3) halting Dr. Grain's paychecks; 4) leaking Dr. Grain's peer review information, thereby, injuring his

reputation; 5) permitting Ms. Salo and others access to his peer review information so it could be used against him; and 6) instructing Mr. Goldenbogen to solicit Peer Review information that Dr. Grain was not complying with the pre-operative consultations; 7) directing Dr. Valjee to tell Dr. Grain to release his IGA; 8) dictating "the timing of January 1999 meetings to secure a release 'or else'"; and 9) persuading the Executive Committee to only extend Dr. Grain's privileges for 10 days because Trimmer believed Dr. Grain was about to sign the IGA release. (Pl's. Br. Summ. J. Count VII, pp 5-6.)

## Analysis

### I. Tortious Interference with Business Relations

Dr. Grain and Defendants argue that they are each entitled to summary judgment on Dr. Grain's intentional interference with business relations claims. This Court will address the parties arguments in turn below.

Dr. Grain argues that Defendants are precluded from litigating this claim before this Court by the doctrine of collateral estoppel. There are four elements of collateral estoppel or issue preclusion: 1) the issue precluded must be the same one involved in the prior proceeding; 2) the issue must actually have been litigated in the prior proceeding; 3) determination of the issue must have been a critical and necessary part of the decision in the prior proceeding; and 4) the prior forum must have provided the party against whom estoppel is asserted a full and fair opportunity to litigate the issue. *Central Transport, Inc. v. Four Phase Systems, Inc.*, 936 F.2d 256, 259 (6th Cir. 1991) (citing *N.L.R.B. v. Master Slack and/or Master Trousers Corp.*, 773 F.2d 77, 81 (6th Cir. 1985)). Collateral

estoppel effect is properly given to "issues actually litigated in an arbitration proceeding between the same parties unless the procedures were unfair." *Id.* (citing *Ivery v. United States*, 686 F.2d 410, 413, *cert. denied*, 460 U.S. 1037, 103 S. Ct. 1428 (1983)).

Dr. Grain argues that the arbitration panel's finding that Defendants' conduct in securing his release of the IGA was wrongful and overreaching establishes his tortious interference with business relations claim. Defendant contends that the arbitration panel did not make any findings on whether Defendants' actions in securing the release constituted intentional interference with Dr. Grain's business relations.

The arbitration panel's finding that Defendant's actions in securing the release were wrongful does not preclude the litigation of Dr. Grain's tortious interference with business relations claim before this Court. In order to prevail on such a claim, Dr. Grain must show that Defendants committed a "*per se* wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the business relationship of another." *Feldman v. Green*, 138 Mich. App. 360, 378 (1984). The Michigan courts have held that a *per se* wrongful act is an inherently wrongful act with malice or an act that is never justified under any circumstances. *Formall v. Comm. Nat'l. Bank*, 166 Mich. App. 772, 780 (1988). The arbitration panel found that Defendant's actions in securing the release were wrongful for the purposes of Dr. Grain's rescission claim. The arbitration panel did not decide whether Defendants actions were "*per se* wrongful," in the context of a tortious interference with business relations claim. Nor did the arbitration panel make findings about whether Defendants' acts were inherently wrongful,

7

committed with malice or were unjustifiable under any circumstances. Consequently, collateral estoppel does not bar the litigation of Dr. Grain's tortious interference with business relations claim before this Court. Dr. Grain, therefore, is not entitled to summary judgment.

Defendant first argues that Dr. Grain's tortious interference with business relations claim is time barred. The statute of limitations for tortious interference with business relations claim is three years. MICH. COMP. LAWS § 600.5805(10); *Blazer Foods, Inc. v. Restaurant Properties, Inc.*, 259 Mich. App. 241, 253-54 (2003). Under Michigan law, this limitation period begins to run at the time all elements can be alleged in a complaint. *Id*. at 254. The elements of a tortious interference with business relations claim are: 1) the existence of a valid business relationship or expectancy; 2) knowledge of the relationship or expectancy on the part of the interferer; 3) an intentional or improper interference with the relationship that induces or causes a breach or termination of the relationship or expectancy; and 4) resultant damage to the party whose relationship or expectancy had been disrupted. *Health Call of Detroit v. Atrium Home & Health Care Services*, 268 Mich. App. 83, 90 (2005).

At issue here is the timing of the incidents underlying Dr. Grain's tortious interference with business relations claim. Therefore, this Court must determine if a factual dispute exists concerning when all of the elements of the tort were present. Dr. Grain alleges four different instances of interference, each of which resulted in a different injury: 1) performance monitoring and review between 1998 and 1999, resulting in his

ruined reputation and the loss of patient referrals; 2) the transferring of all neurosurgery cases from the hospital in 2000, inhibiting him from building his practice; 3) the bad recommendation by Dr. Baldwin to the Ohio hospital in 2001, preventing him from relocating; and 4) the closing of the intracranial surgery program by Mercy in 2003, resulting in the end of his neurosurgery career.[2] (Pl's. Resp. to Defs.' Cross-Mot. for Summ. J. Count VI, pp 3-8.) Dr. Grain's intentional interference with business relations claims based on the first injury that he alleges, wrongful performance review, is barred by the statute of limitations because it occurred before June 26, 2000. Dr. Grain's intentional interference with business relations claims based on the last three injuries are not barred as untimely because, at minimum, there is a genuine issue of material fact regarding when all of the elements of the claim were present. Granting summary judgment on Plaintiffs' entire count, as untimely, is, therefore, inappropriate at this time. Nonetheless, Dr. Grain is barred from pursuing intentional interference with business relations claims related to injuries suffered before June 26, 2000.[3]

---

[2] Defendants argue that Dr. Grain has improperly raised these instances of interference in his response to Defendants' cross-motion for summary judgment, and asks this Court not to consider Dr. Grain's allegations because Dr. Grain did not raise them in his motion for summary judgment or in the complaint. Dr. Grain did, however, allege this conduct in the complaint. (Compl. ¶¶ 81-82, ¶¶ 84-85, ¶ 87, ¶¶ 92-93.) Therefore, the Court will consider the allegations.

[3] In his motion for summary judgment on Count VI, Dr. Grain argues that he has definitively established that Defendants' interference with his referral network was wrongful, and there is no genuine issue of material fact on his claim of intentional interference with business relations. Dr. Grain alleges that Defendants' interference with his referral network occurred between 1998 and 1999. This specific intentional

9

Defendants also argue that they are entitled to summary judgment because there is no genuine issue that Dr. Grain has not established the elements of tortious interference with business relations. Defendants first allege that Dr. Grain has not shown that he had a valid business expectancy in his prospective relationships with unidentified patients in the Port Huron area, or that Defendants knew about his supposed valid business expectancy. An "expectancy must be a reasonable likelihood or probability, not mere wishful thinking." *Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich. App. 361, 377 (1984).

The evidence would support a finding that Dr. Grain had a reasonable and valid business expectancy, in general, to treat neurosurgery patients, considering his medical education and training and Mercy's recruitment and hiring of him and its expressed desire to establish a neurosurgical practice to serve the Port Huron area. Moreover, all Defendants would certainly be aware of Dr. Grain's expectancies. Dr. Grain, therefore, has presented sufficient evidence on the first two elements of his tortious interference with business relations claim to survive summary judgment.

Defendants next argue that Dr. Grain has not presented sufficient evidence on the third element of his tortious interference with business relations claim: an intentional or improper interference with the relationship that induces or causes a breach or termination of the relationship or expectancy. Defendants generally allege that Dr. Grain has pointed

---

interference with business relations claim is, therefore, time barred, and Dr. Grain is not entitled to judgment as a matter of law on this count.

10

to no evidence in the record to show that Defendants intentionally or improperly interfered with Dr. Grain's business or expectancy. In response, Dr. Grain points to the following incidents: the transferring of all neurosurgery cases from the hospital in 2000, inhibiting him from building his practice; the bad recommendation by Dr. Baldwin to the Ohio hospital in 2001, preventing him from relocating; and the closing of the intracranial surgery program by Mercy in 2003, resulting in the end of his neurosurgery career.

Defendants contend that they are entitled to summary judgment because Dr. Grain has not offered any evidence to support his claim that Dr. Baldwin, the head of the hospital's emergency room, transferred all neurosurgery patients to other hospitals.[4] At Dr. Grain's deposition, Defendants presented him with a document listing all of the neurosurgery patients transferred to other hospitals from the emergency room from 1997 to 2003. (Defs.' Reply Br. Ex. C, p 320.) Dr. Grain had not reviewed the document and only became aware of it the day before. (*Id.*) Dr. Grain and defense counsel went over the document and, in the end, Dr. Grain agreed that of the patients transferred, he took issue with five of the transfers. (*Id.* at 332-333.) Dr. Grain stated, however, that he wanted the opportunity to review the document and the underlying medical records to determine whether he had complaints about any of the other transfers. (*Id.* at 333.) At

---

[4]Defendants claim that Dr. Grain's claim may be dismissed summarily because Dr. Baldwin is no longer a defendant in this case. Without deciding whether Mercy is liable for Dr. Baldwin's actions, this Court notes that Dr. Grain asserts that Mercy condoned Dr. Baldwin's practice of referring neurosurgery patients to other hospitals and is, therefore, liable for his actions. (Pls.' Resp. to Defs.' Cross-Mot. Summ. J. Count VI, p 5.)

this time, Dr. Grain has not provided any evidence supporting his claim that the hospital's policy was to transfer all neurosurgery patients to other hospitals, nor has he undermined the veracity of the document Defendants prepared listing the transfers and the reason for transfer. Dr. Grain rests solely on his allegation that, "in 2000, Mercy Hospital condoned the policy of Dr. Jere Baldwin, its Director of the Emergency Room of transferring all neurosurgery cases out of Mercy and refusing to refer any patients to Dr. Grain." (Pl's. Resp. Defs.' Cross-Mot. Summ. J. Count VI, p 5; Complaint, ¶ 81.) Defendants met their burden of showing that there is not a genuine issue for trial; therefore, Dr. Grain must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co.*, 475 U.S. at 587, 106 S. Ct. at 1356. Dr. Grain has not presented sufficient evidence upon which a jury could reasonably find for him; at most he has proffered a "scintilla of evidence," which is insufficient to survive summary judgment. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512. Defendants are entitled to summary judgment on Dr. Grain's claim that they interfered with his business relations by transferring all neurosurgery patients from the emergency room to other hospitals.

With respect to Dr. Grain's tortious interference with business relations claim based on Dr. Baldwin's poor recommendation, Defendants are entitled to summary judgment. Dr. Baldwin, who gave the poor recommendation of Dr. Grain to the Ohio hospital, is no longer a defendant in this case, and Dr. Grain has not alleged that any of the remaining Defendants participated in the poor review. Also, Dr. Grain has not

12

presented any evidence showing that he had a valid business expectancy in Ohio, that any of the Defendants knew about the business expectancy, or that the remaining Defendants intentionally or improperly interfered with his business expectancy in Ohio. Summary judgment is, therefore, appropriate on this claim.

Lastly, Defendants argue that Dr. Grain's claim regarding the closure of the intracranial service fails because Defendants did not commit an intentional or improper act in discontinuing the intracranial surgery program. Defendants contend that the intracranial service was closed due to the low number of craniotomies performed at the hospital, and the nursing staff's concern about their ability to safely care for craniotomy patients. Defendants submit that the discontinuation of craniotomies did not affect Dr. Grain's hospital privileges or preclude him from performing neurosurgery at Mercy, and the evidence Dr. Grain submits to the contrary is inadmissible hearsay. Dr. Grain contends that the intracranial surgery program was shuttered as a part of the "final assault" Defendants launched against him to drive him completely from practice, and relies on statements from colleagues present at the meetings regarding the closure of the intracranial service to show that Defendants' reasons for discontinuing the intracranial surgery program were pretextual. (Pl's. Resp. Br. to Defs'. Mot. Summ. J. Count VI, pp 5-6.)

Because Plaintiff relies solely on hearsay to create a factual question regarding the closure of the intracranial surgery program, Defendants are entitled to summary judgment. "Hearsay is a statement, other than one made by the declarant while testifying

13

at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). Dr. Grain asserts that Dr. Valjee told him, following a board of directors meeting on December 2, 2002, that members of the medical staff questioned Dr. Grain's competence and the nursing staff's competence to perform intracranial surgeries. Dr. Valjee also told Dr. Grain that concern was expressed about the cost of retraining the nursing staff. Dr. Grain further asserts that Dr. Coury told him that the task force assigned to make recommendations about the intracranial surgery program could not reach a consensus at the first meeting, and that physicians on the task force thought that intracranial surgery should proceed, even though few intracranial surgeries were performed each year. All of these statements are hearsay, and Dr. Grain has not pointed to any admissible evidence to support his claim that Defendants discontinued the intracranial surgery program in order to destroy his practice, rather than for the financial reasons proffered by Defendants. "A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." *Sperle v. Michigan Dep't of Corrections*, 297 F.3d 483, 495 (6th Cir. 2002) (citation omitted). Moreover, evidence that Dr. Grain was not appointed to the committee that recommended closing intracranial does not show that Defendants' decision to shutter intracranial was wrongful *per se*. Dr. Grain has failed to meet his burden of proof of creating a factual issue for trial with admissible evidence; therefore, summary judgment on this claim is warranted.

**II. Tortious Interference with Contractual Relations**

Dr. Grain and Trimmer each argue that they are each entitled to summary judgment on Dr. Grain's intentional interference with contract relations claims. This Court will address the parties arguments in turn below.

Dr. Grain argues that he is entitled to summary judgment on his claim of intentional interference contractual relations. The elements of tortious interference with contract are: "1) a contract, 2) a breach, and 3) an unjustified instigation of the breach by the defendant." *Derdiam v. Genesys Health Care Systems*, 263 Mich. App. 364, 382 (2004) (quoting *Mahrle v. Danke*, 216 Mich. App. 343, 350 (1996)). "One who alleges tortious interference with a contractual obligation must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in the law for the purpose of invading the contractual rights or business relationship of another." *CMI Intl'l, Inc. v. Internet Int'l Corp.*, 251 Mich. App. 125, 131 (2002) (quoting *Feldman v. Green*, 138 Mich. App. 360, 378 (1984)). "If the defendant's conduct was not wrongful *per se*, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference." *Id.*

Dr. Grain argues that the first two elements of the intentional interference claim are undisputed, and the third element, "unjustified instigation of the breach by the defendant," was already litigated at arbitration and should be given collateral estoppel effect. Dr. Grain bases his argument regarding the third element on the Arbitration Panel's statement pertaining to the rescission claim that was submitted to arbitration. In the Arbitration Award, the Panel explained:

15

> [W]e do believe that Dr. Grain was acting under duress in signing the Release **and** Mercy engaged in overreaching conduct in securing the Release. Only one of these action is necessary to support the invalidity of the Release . . . .
> The panel does not believe that Respondants committed an illegal act, but that their actions were wrongful.

(Pl.'s Mot. Summ. J. Count VII at 1-2, Ex. 4, pp 8-9) (emphasis in original).

As noted above, there are four essential elements of collateral estoppel or issue preclusion: 1) the issue precluded must be the same one involved in the prior proceeding; 2) the issue must actually have been litigated in the prior proceeding; 3) determination of the issue must have been a critical and necessary part of the decision in the prior proceeding; and 4) the prior forum must have provided the party against whom estoppel is asserted a full and fair opportunity to litigate the issue. *Central Transport*, 936 F.2d at 259. Collateral estoppel effect is properly given to "issues actually litigated in an arbitration proceeding between the same parties unless the procedures were unfair." *Id*.

Dr. Grain argues that the arbitration panel's finding that Defendants acted wrongfully with regard to the rescission claim precludes re-litigation of whether Defendants acted wrongfully with regard to the intentional interference with a contractual relation claim. Defendants argue that Plaintiffs' collateral estoppel argument fails because the identity of issues required to satisfy the first element of issue preclusion is not present in this case.

The Court agrees with Defendants that Dr. Grain has not satisfied the first element necessary for collateral estoppel, and, in turn, has not satisfied the third element of his

intentional interference claim. The intentional interference issue is clearly not the same issue as the rescission claim that was actually submitted to arbitration. *See Overstreet v. Lexington-Fayette Urban County Gov't*, 115 Fed. Appx. 806, 812 (6th Cir. 2004) (holding that a previous finding that plaintiff's procedural due process rights had been violated in the specific context of the district court's review of a hearing administered by defendant was a separate and distinct issue from the constitutionality of defendant's policy). While the arbitration panel categorized Defendants' actions as wrongful with regard to Dr. Grain's rescission claim, the arbitration panel did not make a factual finding that Defendants intentionally committed a *per se* wrongful act, a necessary finding in order to prevail on an intentional interference with contract relations claim. Because Dr. Grain does not provide any alternative arguments as to why the third element of the intentional interference claim has been satisfied, the Court denies Dr. Grain's motion for summary judgment with regard to the intentional interference with contractual relations claim.

Defendant Trimmer[5] moves pursuant to FED. R. CIV. P. 56 for entry of summary judgment on Count VII of Plaintiffs' Complaint on the grounds that: 1) the claim set forth therein is barred by Michigan law and Michigan's three-year statute of limitations applicable to tort actions, MICH. COMP. LAWS § 600.5805(10), and 2) no genuine issue exists for trial that Plaintiffs have not established the necessary elements of the claim.

---

[5]Although Count VII also names as a Defendant Dr. Mahmoud Chafte, the Court has dismissed him from the case. (Docket No. 111).

Under MICH. COMP. LAWS § 600.5805(10), tort actions have a three-year statute of limitations. "A plaintiff's cause of action for a tortious injury accrues when all the elements of the cause of action, including the element of damage, have occurred and can be alleged in a proper complaint." *Travelers Ins. Co. v. Guardian Alarm Co. of Mich.*, 231 Mich. App. 473, 480 (1998). The elements of a claim of tortuous interference with contract are: 1) a contract, 2) a breach, and 3) an unjustified instigation of the breach by the defendant. *Derderian v. Genesys Health Care Systems*, 263 Mich. App. 364, 382 (2004). Thus, once these elements are present, the statute of limitations starts running. Defendants argue that the statute of limitations has run on Plaintiffs' cause of action, explaining that the elements of the claim were present no later than February 2, 1999, more than four years before Plaintiffs' Complaint was filed on June 26, 2003.

With respect to the first element, a contract, Dr. Grain points to four alleged sources of contracts: 1) the IGA with Defendant Mercy (Pl.'s Mot. Summ. J. Count VII p 2, Ex. 2); 2) alleged contracts arising out of the grant of medical staff privileges at the Hospital (*Id.*, Ex. 31); 3) Mercy's peer review policy (*Id.*, Ex. 6); and 4) contracts with various third party payors and managed health plans. (*Id.*) At the outset, this Court notes that the only contractual relationship Dr. Grain alleged in his complaint was the one created by the IGA between himself and the hospital. Dr. Grain may not, therefore, rely on the three other contract sources he identifies to defeat Trimmer's motion for summary judgment.

Regarding the first element of a tortious interference with contractual relations

claim, it is undisputed that Dr. Grain's IGA with the hospital was terminated on February 2, 1999. (*Id.*) Thus, the first element of the tortuous interference claim occurred as of February 1999, for the purposes of the statute of limitations. As to the second element, a breach, the arbitration panel concluded that Mercy breached the IGA by terminating it without cause in June 1998, when Mercy suspended payments to Dr. Grain, at the earliest, or in January 1999, when Mercy Vice President Thomas Goldenbogen sent Dr. Grain a notice of termination, at the latest. (Defs.' Cross-Mot. for Summ. J. Count VII p 2, Ex. A, p 9.) Thus, the second element of the tortuous interference claim occurred as of January 1999, at the latest, for the purposes of the statute of limitations.

As to the third element, "an unjustified instigation of breach by the defendant," every act that Dr. Grain claims constituted an unjustified instigation of a breach of alleged contracts occurred prior to February 2, 1999. Dr. Grain relies on the arbitration panel's finding that Mercy engaged in "wrongful" conduct in securing the February 2, 1999 release that operated to terminate his IGA, contending that this finding establishes liability on the tortuous interference claim. The arbitration panel's finding with regard to "wrongfulness" is relevant only to show that the "wrongful" conduct upon which Dr. Grain bases his claim occurred prior to February 2, 1999, and thus was more than four years before suit was filed. Additionally, "The Plan" to tortiously interfere that Dr. Grain describes in his brief refers to events that took place prior to February 2, 1999. Thus, the third element of the tortuous interference claim had occurred no later than February 2, 1999 for the purposes of the statute of limitations.

Because tort actions have a three-year statute of limitations under Michigan law, and all of the elements of the cause of action occurred no later than February 2, 1999, Count VII of Plaintiffs' Complaint against Trimmer is barred by the three-year statute of limitations. Thus, the Court grants Trimmer summary judgment on Count VII of Plaintiffs' Complaint.

### III. Conclusion

Because Dr. Grain failed to establish that he is entitled to judgment as a matter of law, he is not entitled to summary judgment. *See* FED. R. CIV. P. 56(c). However, Defendants established that Dr. Grain did not meet his evidentiary burden necessary to survive summary judgment on his tortious interference with business relations claims. Also, Dr. Grain's tortious interference with contractual relations claims are time-barred. Therefore, Defendants are entitled to summary judgment. Accordingly,

**IT IS ORDERED,** that Dr. Grain's Motions for Summary Judgment on Counts VI and VII are **DENIED** and Defendant's Cross-Motions for Summary Judgment on Counts VI and VII are **GRANTED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Elmer L. Roller
Gary P. Supanich
Richard J. Seryak
Linda O. Goldberg
W. Mack Faison