UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETER G. GRAIN, M.D. and ANNETTE
BARNES, M.D.,

   Plaintiffs,

v.

               Case No. 03-72486

TRINITY HEALTH, MERCY HEALTH
SERVICES, INC., d/b/a MERCY     Honorable Patrick J. Duggan
HOSPITAL-PORT HURON, MARY R.
TRIMMER, JERE BALDWIN, M.D.,
BERNARD VELARDO, M.D., and
MAHMOUD CHAFTE, M.D.,

   Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on October 13, 2009.

PRESENT: THE HONORABLE PATRICK J. DUGGAN
U.S. DISTRICT COURT JUDGE

Plaintiffs Peter Grain, M.D. ("Dr. Grain") and Annette Barnes, M.D. ("Dr. Barnes") (collectively "Plaintiffs") filed this lawsuit against Defendants on June 26, 2003. Trinity Health ("Trinity"), its subsidiary Mercy Health Services d/b/a Mercy Hospital - Port Huron ("Mercy" or the "hospital"), and Mercy's President and Chief Executive Officer Mary R. Trimmer ("Trimmer") are the only remaining defendants at this time.[1]

---

[1] By stipulation of the parties, this Court issued an Order on January 27, 2004, dismissing without prejudice Defendants Drs. Jere Baldwin and Bernard Velardo. On

Plaintiffs initially filed a sixteen count complaint against Defendants asserting various theories of liability. Some of those claims were dismissed and other claims were submitted to arbitration in response to a motion to compel arbitration filed by Defendants. The arbitrable claims were resolved in an arbitration award issued on December 12, 2007. The parties then returned to this Court to litigate Plaintiffs' remaining claims. At this time, the only claims alleged in Plaintiffs' complaint that remain against Defendants are the following:

> Dr. Grain's claims of:
>
> (1) race discrimination pursuant to 42 U.S.C. § 1981 (Count I);
> (2) wrongful transfer of patients in violation of the Emergency Medical Transfers and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd(i) (Count II);
> (3) libel and slander (Count VIII); and
> (4) civil conspiracy (Count IX);
>
> and Dr. Barnes' claims for:
>
> (1) interference with business relations (Count XII); and
> (2) loss of consortium (Count XIII).

Plaintiffs previously moved to amend their complaint to add a claim of retaliation in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") and the Court granted Plaintiffs' request; however, Plaintiffs never have filed an amended complaint.

Presently before the Court is Defendants' motion for summary judgment with

---

June 12, 2008, this Court dismissed Defendant Dr. Mahmoud Chafte as a defendant due to his death on May 5, 2004.

respect to Plaintiffs' remaining claims pursuant to Federal Rule of Civil Procedure 56, filed July 23, 2009. Plaintiffs filed a response to the motion on August 12, 2009; Defendants filed a reply brief on August 24, 2009. The Court held a motion hearing on September 24, 2009.

In response to Defendants' motion, Plaintiffs do not address Defendants' arguments that summary judgment should be granted with respect to Dr. Grain's libel and slander claim (Count VIII) and Dr. Barnes' intentional interference with business relations claim (Count XIII). The Court therefore assumes that Plaintiffs concede that these claims should be dismissed.[2] For the reasons that follow, the Court also concludes that Defendants are entitled to summary judgment with respect to Plaintiffs' remaining claims.

## I.     Standard for Summary Judgment

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates

---

[2]Moreover, for the reasons set forth by Defendants in their motion, the Court concludes that they are entitled to summary judgment with respect to these claims.

summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S. Ct. at 2553. Once the movant meets this burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e)). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255, 106 S. Ct. at 2513.

## II.     Factual and Procedural Background

Dr. Grain is a medical doctor specializing in neurosurgery. His wife, Dr. Barnes, is a medical doctor specializing in pediatrics.

Sometime prior to June 7, 1997, Mercy decided to recruit a neurosurgeon to its service area - the Port Huron, Michigan area. Mercy eventually identified Dr. Grain as a prime candidate for the position. On June 27, 1997, Mercy and Dr. Grain entered into an "Income Guarantee Agreement" ("IGA"), whereby Mercy guaranteed Dr. Grain a certain annual income for three years if he located his neurosurgery practice in the area. The

IGA contained an arbitration provision.

Dr. Grain claims that some time after he signed the IGA, he learned that several Mercy administrators and doctors opposed the hospital's agreement with him. Plaintiffs claim that these doctors and administrators subsequently acted in concert to pressure Dr. Grain into relieving the hospital of its financial obligations under the IGA and to drive him and his neurosurgery practice from Mercy. Specifically, Plaintiffs allege that Defendants threatened that Dr. Grain's hospital privileges would not be renewed if he failed to sign a release agreement.

Dr. Grain claims that as a result of this pressure, he agreed to sign a Termination and Mutual Release Agreement on February 2, 1999 (the "Release Agreement"). Eight days later, the hospital's Board of Trustees met and voted to extend Dr. Grain's hospital privileges.

Dr. Grain further alleges that in 2000, Dr. Jere Baldwin, the Director of Mercy's Emergency Room, maintained a policy of transferring all neurosurgery cases out of Mercy and refused to refer any patients to him. Dr. Grain contends that this inhibited him from building his practice. Dr. Grain complained to the hospital's administrators but Mercy took no action. Dr. Grain claims that, as a result, he tried to leave Mercy and began negotiations with a hospital in Cleveland, Ohio in January 2001. When the Ohio hospital contacted Mercy as part of the credentialing process, Plaintiffs claim that Dr. Baldwin "offered a malicious, scathing and defamatory review" of Dr. Grain. (Compl. ¶ 84.)

5

Plaintiffs allege that Defendants began their final assault on Dr. Grain in 2002 by taking steps to end Mercy's Intracranial Surgery Program. The program eventually was closed on April 10, 2003.

On June 26, 2003, Plaintiffs filed this lawsuit against Defendants. Defendants thereafter moved to compel arbitration of a number of Plaintiffs' claims, including Dr. Grain's claims related to his IGA. The Court stayed Plaintiffs' remaining claims pending arbitration.

After 45 days of arbitration, the arbitration panel ruled *inter alia* that the Release Agreement should be rescinded because Dr. Grain signed it under coercion and duress. (Def.'s Mot. Ex. Z at 8.) The panel concluded that Defendants' actions which led Dr. Grain to sign the release were wrongful, but not unlawful. (*Id*. at 9.) Plaintiffs subsequently moved for this Court to confirm the arbitration award, which this Court did in an order issued on February 14, 2008.

### III. Applicable Law and Analysis

#### A. Race Discrimination in Violation of 42 U.S.C. § 1981

42 U.S.C. § 1981 provides, in part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, . . .

42 U.S.C. § 1981(a). Under the statute, as amended in 1991, the term "make and enforce

6

contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). As the Sixth Circuit Court of Appeals has provided, "[t]he statute prohibits intentional race discrimination in the making and enforcing of contracts involving both public and private actors." *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006) (citing *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 852, 867-68 (6th Cir. 2001).

A plaintiff alleging a claim of race discrimination in violation of § 1981 must prove: "that (1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Id.* The intent element can be established by direct or inferential evidence. *Id.* When a plaintiff seeks to demonstrate a § 1981 violation inferentially, courts follow the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981). *Amini*, 440 F.3d at 358.

In Count I of Plaintiffs' complaint, Dr. Grain claims that Defendants discriminated against him "in the enjoyment of all benefits, privileges, terms, and conditions of his contractual relationship with Mercy." (Compl. ¶ 112.) Defendants argue that they are entitled to summary judgment with respect to Dr. Grain's § 1981 claim because the IGA

was the only contract he had with Mercy and any claim arising from that contract– which was rescinded in February 1999– is barred by the applicable four-year statute of limitations. *See* 28 U.S.C. § 1658; *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 124 S. Ct. 1836 (2004) (holding that the four-year limitations period in § 1658 applies to claims arising under the amendment to § 1981 contained in the Civil Rights Act of 1991).

Plaintiffs agree that a four-year statute of limitations applies to Dr. Grain's § 1981 claim, but they argue that consequences flowing from the termination of the IGA continued within that period. Plaintiffs also argue that Defendants discriminatorily interfered with Dr. Grain's contractual relations on the basis of race within the limitations periods in relation to the following areas that are not related to the IGA: "[1] Medical Staff Privileges for his ability to perform intracranial surgery with referrals from Mercy Hospital and its medical roster of more than 200 physicians; [2] Peer Review files; and [3] his contracts and commitments with Blue Cross/Blue Shield of Michigan, Medicare, Medicaid and other third party payors and managed plans, . . ." (Pls.' Resp. Br. at 4.)

It is well-established that a claim under § 1981 accrues at the "time of the *discriminatory act*, not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S. Ct. 28, 29 (1981) (emphasis in original) (citing *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S. Ct. 498, 504 (1980)). In *Ricks*, a faculty member at a state college sued under Title VII of the Civil Rights Act of 1964 and § 1981, alleging that he had been denied tenure on account of his national origin. The Supreme Court held that the applicable statutes of limitations began to run on

the date he was denied tenure:

> [T]he only alleged discrimination occurred– and the filing limitations periods therefore commenced– at the time the tenure decision was made and communicated to Ricks. That is so even though one of the effects of the denial of tenure– the eventual loss of a teaching position– did not occur until later.

449 U.S. at 258, 101 S. Ct. at 504. Here, Dr. Grain signed the Release Agreement in February 1999– more than four years before he filed the present lawsuit. He therefore cannot base his § 1981 claim on Defendants' alleged discriminatory conduct with respect to this contract, even if he continued to suffer the loss of contractual benefits.

Plaintiffs otherwise fail to establish the existence of a contract between Dr. Grain and Mercy or other entities or individuals to support his § 1981 claim. Plaintiffs refer to a contractual relationship with the hospital based on the grant of medical staff privileges to Dr. Grain. Such privileges, however, are governed by the hospital's Medical Staff By-Laws and this Court already has found that they do not establish a contract between the hospital and its medical staff. *Grain v. Trinity Health*, No. 03-72486, 2008 WL 4857948, at *2 (E.D. Mich. Nov. 6, 2008). Plaintiffs further assert that the closure of Mercy's Intracranial Surgery Program interfered with Dr. Grain's contractual relationships with his referral sources, other hospitals, and third-party payors. Plaintiffs present no evidence of a contractual relationship between Dr. Grain and his referral sources or other hospitals or of an impact on those relationships due to Mercy's closure of the program. With respect to Dr. Grain's contractual relationships with third-party payors or insurer

9

agreements, nowhere in Plaintiffs' complaint do they assert that Defendants' conduct impaired such relationships. Moreover, Plaintiffs produce no evidence to suggest that the closure of the Intracranial Surgery Program impaired those contractual relationships.[3]

Plaintiffs contend that "Defendants also interfered with Dr. Grain's contractual relationships with other hospitals, referring physicians and third-party payors on the basis of race discrimination when they and their counsel illegally invaded Dr. Grain's Peer Review File." (Pls.' Resp. Br. at 7.) This Court previously concluded that there is no evidence that Defendants or their counsel unlawfully invaded Dr. Grain's peer review file (*see* Docs. 165, 172). Nevertheless, except for allegations relating to Dr. Baldwin's use of information in Dr. Grain's peer review file to block the latter's relocation to an Ohio hospital, Plaintiffs fail to allege in their complaint that Defendants' invasion of his file somehow interfered with any other contractual relationship. Dr. Baldwin no longer is a defendant in this action.

For the above reasons, the Court concludes that Defendants are entitled to summary judgment with respect to Dr. Grain's § 1981 claim (Count I).

### B.     EMTALA

---

[3]Furthermore, for the reasons asserted by Defendants, this Court believes that Plaintiffs cannot establish that the decision to discontinue the Intracranial Surgery Program was a pretext for discrimination. Defendants' evidence demonstrates that the decision to close the program was based on the low volume of surgeries performed, the risk to patients when the procedure is performed so rarely, and the cost of staff training. (*See* Defs.' Mot. at 5-7 and evidence cited therein.) Notably, at the same time it closed this program, the hospital also closed its obstetrics and pediatric services for financial reasons. (*Id*. at 7.)

In Count II of the complaint, Dr. Grain alleges that he "protested to Mercy administrators, including President Trimmer, concerning the illegal transfer of patients from Mercy's Emergency Room in violation of 42 U.S.C. § 1395dd" and that Mercy retaliated against him "by preventing [him] from continuing to conduct intracranial surgery at Mercy." (Compl. ¶¶ 115, 116.)  The "Whistleblower Protections" provision of EMTALA provides:

> A participating hospital may not penalize or take adverse
> action against a qualified medical person described in
> subsection (c)(1)(A)(iii) or a physician because the person or
> physician refuses to authorize the transfer of an individual
> with an emergency medical condition that has not been
> stabilized or against any hospital employee because the
> employee reports a violation of a requirement of this section.

42 U.S.C. § 1395dd(i).  Defendants argue that Dr. Grain lacks standing to assert a claim under this provision because (1) he never complained that unstable patients were being transferred; (2) he has not and cannot identify any patient transferred from Mercy in an unstable condition; (3) he never refused to authorize the transfer of an unstable patient; (4) he was not a hospital employee; and (5) he never reported any complaints of illegal patient transfers to any governmental agency.  (Defs.' Mot. at 15.)

Plaintiffs do not dispute Defendants' contentions and the Court finds that the undisputed evidence does not support a violation of EMTALA's Whistleblower Protections section.  The undisputed evidence only shows that Dr. Grain complained to Mercy's administration that emergency room physicians had transferred neurosurgery cases out of Mercy without first contacting Dr. Grain.  Dr. Grain never complained that

11

those patients had been transferred in an unstable condition.

Plaintiffs argue in response to Defendants' motion, however, that Dr. Grain has standing under EMTALA's civil enforcement provision, 42 U.S.C. § 1395dd(d)(2)(A). Pursuant to this section:

> Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

42 U.S.C. § 1395dd(d)(2)(A). Plaintiffs contend that Dr. Grain has standing to sue under this provision, relying on the Sixth Circuit's recent decision in *Moses v. Providence Hospital and Medical Centers, Inc.*, 561 F.3d 573 (2009). As an initial matter, Plaintiffs did not previously indicate that they are relying on this section for Dr. Grain's EMTALA claim; they did not cite this provision in their complaint. In any event, this Court cannot find that Dr. Grain has standing to sue under § 1395dd(d)(2)(A), even considering the Sixth Circuit's extension in *Moses* of the class of individuals who may sue under this provision.

In *Moses*, the Sixth Circuit extended the class of plaintiffs who may sue under EMTALA's civil enforcement provision beyond patients illegally transferred or released to the estate of a woman who was murdered by her husband when he allegedly was released before his emergency mental illness was stabilized. *Id.* at 579-82. The court concluded that, pursuant to the plain language of the statute, "'any individual who suffers

*personal harm* as a direct result of' a hosptial's EMTALA violation may sue." *Id*. at 580 (citing 42 U.S.C. § 1395dd(d)(2)(A)). This holding does not extend to Dr. Grain, however, particularly because he alleges only financial harm as a result of Defendants' alleged EMTALA violation. (*See* Compl. ¶ 117.) "[E]very court addressing the issue has determined that economic injuries are insufficient for a showing of personal harm under [§ 1395dd(d)(2)(A)]." *Valencia v. Mississippi Baptist Med. Ctr., Inc.*, 363 F. Supp. 2d 867, 880 (S.D. Miss. 2005); *see also Burton v. William Beaumont Hosp.*, 373 F. Supp.2d 707, 716 (E.D. Mich. 2005).

The Court therefore grants summary judgment to Defendants on Dr. Grain's EMTALA claim (Count II).

**C.     ELCRA**

As indicated earlier, Plaintiffs sought and this Court granted them leave to amend their complaint to allege that Defendants retaliated against Dr. Grain in violation of ELCRA. Plaintiffs, however, never filed an amended complaint– a point that this Court noted in two prior decisions.[4] (*See* Doc. 112 at 2 n.1; Doc. 145 at 3 n.2.) For this reason, the Court does not believe that it is necessary to address this claim. In any event, as demonstrated by Defendants, Plaintiffs fail to establish a causal connection between any

---

[4]Plaintiffs in fact had not even attached a proposed amended complaint to their motion to amend the complaint, in which they sought *inter alia* to add Dr. Grain's ELCRA claim . (*See* Doc. 40.) In this Court's opinion granting in part and denying in part Plaintiffs' motion to amend their complaint, it specifically ordered Plaintiffs to submit an amended complaint consistent with the order. (Doc. 61 at 3.)

protected activity by Dr. Grain[5] and Mercy's closure of its Intracranial Surgery Program.[6]

**D.    Civil Conspiracy**

In Count IX of their complaint, Plaintiffs allege that Defendants engaged in a civil conspiracy "to drive Dr. Grain from his good standing in the medical community and to destroy his medical practice by the use of methods that violate various statutes and the common law as described-above." (Compl. ¶ 148.) Defendants seek summary judgment with respect to Dr. Grain's civil conspiracy claim based on the following arguments: (1) Plaintiffs have not alleged an underlying substantive theory as a predicate for his conspiracy claim, particularly one within the applicable limitations period; (2) to the extent Plaintiffs are asserting an underlying breach of contract claim, the claim fails because an action for conspiracy to breach a contract cannot be brought against an

---

[5]The "protected activity" alleged in Plaintiffs' complaint is a conversation between Dr. Grain and Mercy administrators in 1998. In response to Defendants' motion, Plaintiffs also refer to a letter Dr. Grain wrote to Defendant Trimmer on February 26, 2003, in which he supposedly "oppose[d] Defendants' violation of ELCRA." (Pls.' Resp. at 20.) Plaintiffs fail to attach this letter as an exhibit to their brief and the Court was not able to identify it as an exhibit attached to some other pleading on the docket. Assuming Dr. Grain engaged in "protected activity" when he wrote these letters– an issue the Court is not deciding– Plaintiffs fail to establish a causal connection between the activity and Defendants' allegedly retaliatory acts. Plaintiffs fail to establish a causal connection between Dr. Grain's 1998 complaint and the closure of the surgical program in 2003. As Defendants establish, Dr. Grain sent his February 2003 letter several months *after* Mercy began considering the discontinuance of the Intracranial Surgery Program (*see, e.g.*, Defs.' Mot. Exs. P, Q, S) and six weeks after the Board of Trustees voted to suspend the program. (*Id*. Ex. F.)

[6]Any alleged retaliation prior to June 26, 2000, is time-barred by the three year statute of limitations applicable to ELCRA claims. *Garg v. Macomb Mental Health Services*, 472 Mich. 263, 282, 696 N.W.2d 646, 658 (2005).

14

individual or entity who was a signed party to the contract; and (3) Plaintiffs cannot demonstrate illegal or wrongful conduct by defendants. In response, Plaintiffs argue that there is evidence to establish that Defendants conspired to discriminate against Dr. Grain on the basis of race by interfering with his contractual relationships protected under 42 U.S.C. § 1981.

"A conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means." *Fenestra Inc. v. Gulf Am. Land Corp.*, 377 Mich. 565, 593, 141 N.W.2d 36, 48 (1966). The statute of limitations applicable to civil conspiracy claims in Michigan is three years. *Mays v. Three Rivers Rubber Corp.*, 135 Mich. App. 42, 46, 352 N.W.2d 339, 340-41 (1984) (citing Mich. Comp. Laws § 600.5805(8)). Any conduct by Defendants related to the termination of the IGA is barred by the statute of limitations. As discussed earlier, Plaintiffs otherwise fail to establish the existence of a contract between Dr. Grain and Mercy or other entities or individuals to support his § 1981 claim. Dr. Grain's remaining claims have been dismissed or are being dismissed pursuant to this Opinion and Order. Accordingly, Plaintiffs fail to demonstrate that Defendants used criminal or unlawful conduct "to drive Dr. Grain from his good standing in the medical community and to destroy his medical practice." *See supra*. In their response, Plaintiffs also refer to the closure of the Intracranial Surgery Program in 2003– which they assert "was the product of a plan to get rid of Dr. Grain." However, as noted earlier, Defendants' evidence demonstrates that the decision to close the program was not

based on discriminatory reasons.

Defendants therefore are entitled to summary judgment with respect to Dr. Grain's civil conspiracy claim.

### E. Loss of Consortium

Dr. Barnes asserts a loss of consortium claim in Count XIII of the complaint. "[A] claim for loss of consortium is usually considered to be derivative, but only in the sense that it does not arise at all unless the other, impaired spouse has sustained some legally cognizable harm or injury." *Eide v. Kelsey-Hayes Co.*, 431 Mich. 26, 29 (1988). Because this Court has concluded that Dr. Grain lacks a legally cognizable claim, this claim does not survive.

## IV. Conclusion

For the above reasons, this Court concludes that Defendants are entitled to summary judgment with respect to the claims remaining in Plaintiffs' complaint.

Accordingly,

**IT IS ORDERED**, that Defendants' motion for summary judgment is **GRANTED**.

                                                s/PATRICK J. DUGGAN
                                                U.S. District Court Judge

Copies to:
Elmer L. Roller, Esq.
Gary P. Supanich, Esq.
W. Mack Faison, Esq.
Richard J. Seryak, Esq.
Linda O. Goldberg, Esq.